1 | Christopher A. Villasenor, Esq. (SBN 147118)
**CATALYST LAW GROUP**
2 | **A PROFESSIONAL CORPORATION**
9710 Scranton Road, Suite 170
3 | San Diego, CA 92121
Telephone: (858) 450-0099
4 | Facsimile: (858) 450-9834

5 | Attorney for Plaintiffs
JAMES GROOMS AND BRYCEMARIE PHELAN AND KNUKLE, INC., A COLORADO
6 | CORPORATION

*FILED*

*2009 MAR 11 PM 3:25*

*CLERK US DISTRICT COURT*
*SOUTHERN DISTRICT OF CALIFORNIA*

BY_____ *DEPUTY*

7 | **UNITED STATES DISTRICT COURT**

8 | **SOUTHERN DISTRICT OF CALIFORNIA**

9 |

10 | JAMES GROOMS, an individual;
BRYCEMARIE PHELAN, an individual;
11 | KNUKLE, INC., a Colorado corporation,

12 |                         Plaintiffs,

13 | vs.

14 | JOHN LEGGE, an individual; GWEN
LEGGE, an individual; KNUKLE, INC., a
15 | California corporation; ARTILLERY
DISTRIBUTION, an unknown entity; SEAN
16 | MYERS, an individual; DEVIN MERCADO,
an individual;; and DOES 1 through 50,
17 | inclusive,

18 |                         Defendants.

19 |

Case No.

**'09 CV 0489 IEG POR**

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
PLAINTIFFS' EX PARTE APPLICATION
FOR A TEMPORARY RESTRAINING
ORDER AND ORDER TO SHOW CAUSE
RE: PRELIMINARY INJUNCTION**

20 |
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |



1

# TABLE OF CONTENTS

2    I. Introduction ............................................................................................................... 1

3    II. Statement of Facts ................................................................................................... 1

4       A. Plaintiffs' Trademark Rights In The "Knukle, Inc.," "Knukle Inc" and

5    "Knukle" Trademarks .............................................................................................. 1

6       B. Defendants' Infringing Use Of Plaintiffs' "Knukle, Inc.," "Knukle Inc" and "Knukle"
Trademarks ............................................................................................................. 2

7    III. The Standard For A Temporary Restraining Order And Preliminary Injunction ........... 5

8    IV. Plaintiffs Are Likely to Succeed on the Merits of Their Trademark Claims and Federal Claims
for Unfair Competition Under Section 43(a) of the Lanham Act, 15 U.S.C. 1125(a), And Therefore
9    the T.R.O. And Order To Show Cause Should Be Issued ............................................. 6

10      A. Plaintiffs' Marks Are Valid And Protectable ..................................................... 8

11      B. Defendant's Use Of Plaintiffs' Trademarks Is Likely To Cause Consumer Confusion About
The Origin Of The Goods .......................................................................................... 9

12

13        1. Strength of the Mark ................................................................................ 10

14        2. Proximity of the Goods ............................................................................ 11

        3. Similarity of the Marks ............................................................................ 11

15        4. Evidence of Actual Confusion .................................................................. 12

16        5. Marketing Channels Used ........................................................................ 13

17        6. Type Of Goods And Degree Of Care Likely To Be Exercised By The Purchaser ..... 13

        7. Defendant's Intent in Selecting The Mark .................................................. 14

18        8. Likelihood Of Expansion Of The Product Lines ......................................... 15

19    V. Plaintiffs Will Suffer Irreparable Harm in the Absence of Equitable Relief................ 15

20    VI. Plaintiffs Will Likely Succeed On Their Claims For Unfair Competition Under California
21    Business & Professions Code Section 17200 et seq. .................................................... 16

22    VII. Plaintiffs Are Likely to Succeed on Their Claims for Tortious Interference with Prospective
Economic Advantage ................................................................................................. 17

23    VIII. Plaintiffs Are Likely to Succeed on Their Claims for Conversion.......................... 18

24

25    IX. Plaintiffs Are Likely To Succeed on Their Claims for Cybersquatting...................... 18

26    X. The Balance Of Harm Favors Issuing An Immediate Injunction ............................... 18

27    XI. The Bond Amount Should Be Small ..................................................................... 19

28

XII. Plaintiffs Request Expedited Discovery ............................................................. 20

XIII. Conclusion ........................................................................................................ 20

**TABLE OF AUTHORITIES**

<u>Cases</u>

*Academy of Motion Picture Arts and Sciences v. Creative House Promotions,*
944 F.2d 1446 (9th Cir. 1991) ...................................................................   14, 16

*AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341 (9th Cir. 1979) ...........................   9

*Apple Computer, Inc. v. Formula Int'l, Inc.,* 725 F.2d 521 (9th Cir. 1984) .............   10, 13

*Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 506-507 (1959)..........................   15

*Cadence Design Systems, Inc. v. Avant! Corp.,* 125 F.3d 824 (9th Cir. 1997) .............   19

*Cianci v. Superior Court,* 40 Cal. 3d 903 (1985) ..............................................   17

*Columbia Pictures Indus., Inc. v. Miramax Films Corp.,* 11 F. Supp. 2d 1179
(C.D. Cal. 1998) ....................................................................................   15

*Creative Technology, Ltd. v. SRT, Inc.,* 29 U.S.P.Q.2d 1474 (N.D. Cal. 1993) ...........   6, 7, 8

*Dr. Seuss Enterprises L.P. v. Penguin Books USA, Inc.,* 109 F.3d 1394 (9th Cir. 1997),
*cert. dismissed,* 521 U.S. 1146 (1997) ...........................................................   7, 10, 16

*E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280 (9th Cir. 1992) ...............   7

*eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391-392 (2006) .....................   16

*G.S. Rasmussen & Associates., Inc. v. Kalitta Flying Service, Inc.,* 958 F.2d 896, 906
(9th Cir. 1992)........................................................................................   18

*Hotmail Corp. v. Van$ Money Pie Inc.,* 47 U.S.P.Q.2d 1020, 1998
WL 388389, at *4 (N.D. Cal.)...................................................................   7, 10, 13, 19

*In the Matter of Vuitton et Fils S.A.,* 606 F.2d 1 (2d Cir. 1979) ...........................   6

*Int'l Controls Corp. v. Vesco,* 490 F2d 1334, 1356 (2d Cir. 1974) ........................   19

*Jayair v. Muka Indus., Inc.,* 33 U.S.P.Q.2d 1304, 1994 WL 744642, *2
(C.D. Cal. 1994).....................................................................................   10, 12

*Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery,* 150 F.3d 1042 (9th Cir. 1998) ...   8

*Mayo v. U.S Gov't Printing Office,* 39 F. Supp. 697 (N.D. Cal. 1992), *aff'd,*
9 F.3d 1430 (9th Cir. 1993) .......................................................................   6

*Miller v. California Pacific Medical Center,* 19 F.3d 449 (9th Cir. 1994) (en banc) .......   6

*Ocean Garden, Inc. v. Marktrade Co., Inc.,* 953 F.2d 500 (9th Cir. 1991) .................   10

1  *Peaches Entertainment Corp. v. Entertainment Repertoire Assocs., Inc.,*
    62 F.3d 690 (5th Cir. 1995) ……………………………………………………….... 6
2
   *Stanley v. University of Southern California*, 13 F.3d 1313, 1320 (9th Cir. 1994)……… 15
3
   *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 112 S. Ct. 2753 (1992) …………... 6
4
   *Willis v. Santa Ana etc. Hospital Assn.,* 58 Cal. 2d 806 (1962) ………………………….. 17
5
   Yokohama Tire Corporation v. Dealers Tire Supply, Inc.,
6  202 F.R.D. 612, 613 (D. Ariz. 2001)……………………………………………………….20

7  **Statutes**

8  15 U.S.C. § 1116(a) …………………………………………………….... 6, 8

9  15 U.S.C. § 1125(a) …………………………………………………….... 6, 7, 8, 9

10 California Business & Professions Code § 17200 …………………………………... 16, 17

11 California Business & Professions Code § 17203 ………………………………….. 17

12 California Business & Professions Code § 17500 …………………………………… 16

13 **Other Authorities**

14 Federal Rule of Civil Procedure 65(c)…………………………………………….... 19

15 I. J. Gilson, *Trademark Protection and Practice,* § 3.02[2] (Matthew Bender & Co. 1999 ed.) … 8

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.      Introduction

This is an application for a temporary restraining order by Plaintiffs James Grooms, Brycemarie Phelan, and Knukle, Inc., a Colorado corporation (collectively hereinafter, "Plaintiffs") to enjoin the infringement of Plaintiffs' "Knukle, Inc.," "Knukle Inc" and "Knukle" trademarks by its direct competitor, Knukle, Inc., a California corporation (hereinafter, "Knukle Two"), and Plaintiffs' former business partners who own and/or control Knukle Two; namely, Defendants John Legge, Gwen Legge, Artillery Distribution, Sean Myers, Devin Mercado, and Cory Santaniello (collectively hereinafter, "Defendants").

## II.     Statement of Facts
### A.      Plaintiffs' Trademark Rights In The "Knukle, Inc.," "Knukle Inc" and "Knukle" Trademarks

Plaintiffs are the exclusive owners of the "Knukle, Inc.," "Knukle Inc" and "Knukle" trademarks for apparel and accessories for the clothing industry. Plaintiffs have been advertising and promoting these trademarks in the United States since July 30, 2008.

Plaintiffs have been in the business of advertising, promoting, and selling "Knukle, Inc.," "Knukle Inc" and "Knukle" merchandise via the Internet, action sports events, word of mouth, and other traditional channels since July 30, 2008. (Declaration of Mr. James Grooms, hereinafter "Grooms' Decl.", ¶¶ 13-15). Plaintiffs coined the "Knukle, Inc.," "Knukle Inc" and "Knukle" trademarks in May 2008. Plaintiffs subsequently invested substantial amounts of time, creative energy, and money in the development and promotion of those trademarks and brands. Plaintiffs have spent approximately $20,000 in marketing and promoting the "Knukle, Inc.," "Knukle Inc" and "Knukle" trademarks. (Grooms' Decl. ¶¶ 2, 5, 9, 10, 14, 16, 34, and 37). Plaintiffs paid for the development of a website, business cards, stickers, hats, apparel, and designed or substantially contributed to the design of all of these materials to emphasize the "Knukle, Inc.," "Knukle Inc" and "Knukle" trademarks. (Grooms' Decl. ¶¶ 2, 5, 9, 10, 14, 16, 34, 37, and Exhibit "4" attached thereto). Plaintiffs, of course, also invested substantial time and energy in managing the "Knukle, Inc." enterprise. (Grooms' Decl. and Declaration of Ms. Brycemarie Phelan (hereinafter, "Phelan's Decl.")).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND OSC RE: PRELIMINARY INJUNCTION

Plaintiffs have an Intent To Use application pending in the United States Patent and Trademark Office ("USPTO") for "Knukle" trademark, with the second "k" in "Knukle" turned backwards. The mark was filed under International Class 025, for goods and services including clothing, namely, t-shirts, hats, shorts, pants, socks, dresses, skirts, and shoes. The "Knukle" application is Serial No. 77497169. Database printouts showing the USPTO's receipt of this application is attached to the Declaration of Mr. Grooms as Exhibit "1". Plaintiffs also have existing United States common law trademarks and remedies under the Lanham Act, based on its advertising and promotion of the "Knukle, Inc.," "Knukle Inc" and "Knukle" trademarks since at least July 30, 2008.

Since the adoption and use of the "Knukle, Inc.," "Knukle Inc" and "Knukle" trademarks, Plaintiffs' business has catapulted forward in a very short time. Since launching the "Knukle, Inc." enterprise, Plaintiffs obtained interest from investors, including Defendants Mr. and Ms. Legge. (Grooms' Decl. ¶¶ 21-25; Phelan's Decl. ¶¶ 15-19). In addition to attracting significant financing for a start-up clothing company, Plaintiffs are informed and believe that the ASR trade show event attended by Defendants Artillery Distribution, Mr. Myers and Mr. Mercado, at the behest of Defendants Mr. and Ms. Legge (after they locked Plaintiffs out of the "Knukle, Inc." enterprise as set forth in more detail below), secured hundreds of thousands of dollars of purchase orders for "Knukle, Inc.," "Knukle Inc" and "Knukle" merchandise. (Grooms' Decl. ¶¶ 53-55, 58-60; Phelan's Decl. 43-44).

**B.    Defendants' Infringing Use Of Plaintiffs' "Knukle, Inc.," "Knukle Inc" and "Knukle" Trademarks**

Knukle Two is now a direct competitor of Plaintiffs. As former investors and supporters of Plaintiffs, and after a falling out with Plaintiffs, Defendants are undoubtedly aware of Plaintiffs' products and Defendants produce and market their competing products through many of the same channels that Plaintiffs use, including Plaintiffs' old website domain address that Defendants misappropriated; very likely, with malicious intent resulting from the fall out between the parties. (Grooms' Decl. ¶¶ 31-35, 39, 42-53, 55-57; Phelan's Decl. ¶¶ 32-46). Knukle Two offers and sells products the same as or similar to Plaintiffs', to the same customers as Plaintiffs, using the same

channels of trade and distribution as Plaintiffs. (Grooms' Decl. ¶¶ 44, 47, 53, 55-56, 58-60; Phelan's Decl. ¶¶ 37, 39, 43-46).

On or about December 26, 2008, immediately after Defendants disagreement with Plaintiffs over the ownership interest in Plaintiffs' "Knukle, Inc." enterprise, Defendant Knukle Two filed an Intent To Use application pending in the United States Patent and Trademark Office ("USPTO") for a "Knukle Inc" trademark, with the second "k" in "Knukle" turned forwards, under International Class 042, for graphics arts design, namely creating designs for use as a decorative or ornamental features on products and packaging. (Grooms' Decl. ¶ 50; and Exhibit "22" attached thereto; Phelan's Decl. ¶ 40). Knukle Two's application included a fraudulent first date of use of June 1, 2008, almost three months before Plaintiffs first met Mr. and Ms. Legge, and days before Plaintiffs first met any of the other Defendants. (Grooms' Decl. ¶ 50 and Exhibit "22" attached thereto; Phelan's Decl. ¶ 40). Knukle Two's "Knukle Inc" application is Serial No. 77636449. Database printouts showing the USPTO's receipt of this application is attached to the Declaration of Mr. Grooms as Exhibit "22".

On or about January 5, 2009, Defendant Mr. Legge filed a second Intent To Use application pending in the USPTO for a "Knukle" trademark (with the second "k" in Knukle turned forwards) under the same International Class 025 including clothing, footwear and accessories that Plaintiffs' federal trademark application is filed under. (Grooms' Decl. ¶ 52 and Exhibit "23" attached thereto; Phelan's Decl. ¶ 42). Mr. Legge's application included a fraudulent first date of use of June 1, 2008, almost three months before Plaintiffs first met Mr. or Ms. Legge, and days before Plaintiffs first met any of the other Defendants. (Grooms' Decl. ¶ 52 and Exhibit "23" attached thereto; Phelan's Decl. ¶ 42). Mr. Legge's "Knukle, Inc." application is Serial No. 77643673. Database printouts showing the USPTO's receipt of this application is attached to the Declaration of Mr. Grooms as Exhibit "23".

Knukle Two, which Plaintiffs are informed and believe is under the ownership and/or control of all other Defendants, recently launched an infringing advertising and marketing campaign using Plaintiffs' "Knukle, Inc.," "Knukle Inc" and "Knukle" trademarks. On January 30,

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' EX PARTE APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND OSC RE: PRELIMINARY INJUNCTION

2009, Defendants Knukle Two, Mr. and Ms. Legge, Artillery Distribution, Mr. Myers and Mr. Mercado (collectively hereinafter, "Defendants") launched a website owned and formerly controlled by Plaintiffs, www.knukleinc.com, that advertised for sale all of the designs that Plaintiffs developed with and without the assistance of Artillery Distribution identically with one slight variation: the second "k" in Knuckle, Inc. was turned forwards (however, on some of the tags of the women's apparel, the second "k" is remains turned backwards). (Grooms' Decl. ¶¶ 55-56 and Exhibit "26" attached thereto; Phelan's Decl. ¶¶ 44-45). The choice of Defendants to appropriate for themselves the intellectual property and other assets of Plaintiff associated with the "Knukle, Inc.," "Knukle Inc" and "Knukle" marks can be interpreted as nothing short of a deliberate attempt by Defendants to infringe the two trademarks that Plaintiffs started using months before they first met Defendants, and each of them. It can hardly be a coincidence that Defendants decided to start marketing "Knukle, Inc.," "Knukle Inc" and "Knukle" merchandise with the second "k" in "Knukle" turned forwards just days after Defendants split from Plaintiffs' "Knukle, Inc." enterprise and absconded with Plaintiffs' certain tangible and intangible personal property.

Moreover, on January 22-24, Defendants appeared at the Action Sports Retailers trade show (the "ASR trade show"). Held annually in Downtown San Diego, California in late January, the ASR trade show touts itself as the "most powerful buying event in the action sports industry." (Grooms' Decl. ¶ 53 and Exhibit "24" attached thereto; Phelan's Decl. ¶ 43). Defendants appeared there with a booth emblazoned with the same infringing references to "Knukle, Inc.," "Knukle Inc" and "Knukle," offering for sale "Knukle Inc" and "Knukle" merchandise that was identical in most every respect with Plaintiffs' merchandise and designs with one slight variation: the second "k" in Defendants' "Knuckle, Inc." merchandise was turned forwards. (Grooms' Decl. ¶ 53 and Exhibit "24" attached thereto; Phelan's Decl. ¶ 43).   Thus, Defendants recently began using both of Plaintiffs' trademarks, "Knukle, Inc.," "Knukle Inc" and "Knukle" for a line of apparel and accessories that target mixed martial arts and extreme sports fans using a name and marks that look and sound identical to Plaintiffs' "Knukle, Inc.," "Knukle Inc" and "Knukle" brand merchandise.

1  This use of Plaintiffs' core fundamental trademarks is clear evidence of Defendant's intentions to

2  deceive and confuse customers and prospective purchasers.

3       It is obvious from even a cursory review of the content on the www.knukleinc.com website,

4  that Defendants have adopted Plaintiffs' "Knukle, Inc.," "Knukle Inc" and "Knukle" trademarks in

5  a deliberate effort to cause consumer confusion and deception. Defendants are deceiving consumers

6  into believing that they are the source of the "Knukle, Inc.," "Knukle Inc" and "Knukle" brand

7  products. (Grooms' Decl. ¶¶ 54, 58 and Exhibits "25" and "29" attached thereto).  As Defendants

8  strategically filed for trademark applications for the terms "Knukle Inc" and "Knukle" with

9  fraudulent dates of first use, and continue to sell "Knukle, Inc." merchandise with nearly identical

10 designs and trademarks under the same trade name to the same customers through the same

11 channels as Plaintiffs, is further evidence of Defendants' bad faith intent to create consumer

12 confusion.

13      Plaintiffs are informed and believe that Defendants are currently having printed in China

14 more than $200,000 worth of "Knukle, Inc." merchandise with a wholesale value of twice that

15 amount and a retail value of twice their wholesale value. (Grooms' Decl. ¶ 59). Plaintiffs are

16 informed and believe that Defendants will import this "Knukle, Inc." merchandise within the next

17 several weeks to fill orders from retailers that were received by Defendants from the ASR trade

18 show. (Grooms' Decl. ¶ 59).

19      Plaintiffs bring this application for a Temporary Restraining Order and an Order to Show

20 Cause Regarding a Preliminary Injunction to enjoin Defendants from further unfair competition and

21 infringement of Plaintiffs' core "Knukle, Inc.," "Knukle Inc" and "Knukle" brand trademarks.

22 Plaintiffs have no adequate remedy at law unless Defendants are temporarily, preliminarily and/or

23 permanently enjoined from committing the aforementioned unlawful acts.

24 **III.    The Standard For A Temporary Restraining Order and Preliminary Injunction**

25      To obtain a temporary restraining order or a preliminary injunction, a party must show

26 "either (1) a likelihood of success on the merits and the possibility of irreparable injury, or (2) the

27 existence of serious questions going to the merits and the balance of hardships tipping in the

28

1    moving party's favor." *Miller v. California Pac. Med. Ctr.,* 19 F.3d 449, 456 (9th CIT. 1994) (en

2    banc); *see also Mayo v. U.S. Gov't Printing Office,* 839 F. Supp. 697 (N-D. Cal. 1992), *aff'd,* 9 F.3d

3    1450 (9th Cir. 1993).

4         In Lanham Trademark Act ("Lanham Act") cases concerning false designations of origin

5    (i.e., claims under 15 U.S.C. § 1125(a)), courts are empowered to use the full extent of their equity

6    powers to grant preliminary injunctive relief. *See* 15 U.S.C. § 1116(a) ("The several courts ... shall

7    have power to grant injunctions, according to principles of equity and upon such terms as the court

8    may deem reasonable ... to prevent a violation under § 1125(a) of this title.").

9         As discussed below, the Court should apply these standards to issue a temporary restraining

10   order followed by a preliminary injunction. Plaintiffs are likely to succeed on the merits and face

11   substantial and irreparable injuries if the injunction is not issued.

12   **IV.    Plaintiffs Are Likely to Succeed on the Merits of Their Trademark Claims and
          Federal Claims for Unfair Competition Under Section 43(a) of the Lanham Act, 15**

13        **U.S.C. 1125(a), And Therefore the T.R.O. And Order To Show Cause Should Be
          Issued**

14        The Defendants' use of "Knukle, Inc.," "Knukle Inc" and "Knukle" is likely to cause, and

15   has, in fact, caused consumer confusion. The Lanham Act was enacted to protect "both consumers'

16   confidence in the quality and source of goods and services and [to] protect businesses' goodwill in

17   their products." *Peaches Entertainment Corp. v. Entertainment Repertoire Assocs., Inc.,* 62 F.3d

18   690, 692 (5th Cir. 1995); *see also Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 767-68, 112

19   S. Ct. 2753, 2757 (1992) ("The Lanham Act was intended to make 'actionable the deceptive and

20   misleading use of marks' and 'to protect persons engaged in commerce against unfair competition.'

21   (citations omitted)). Thus, where a Defendant is distributing goods by using false or confusing

22   designations of origin, the court should issue a temporary restraining order and a preliminary

23   injunction. *See Creative Tech., Ltd. v. SRT, Inc.,* No. C93-3511FMS, 1993 WL 603292 (N.D. Cal.

24   Nov. 8, 1993) (Defendant was preliminarily enjoined under Lanham Act against distributing

25   product under name "Sound Blaster," to protect the plaintiff, owner of Voice Blaster); *accord In the*

26   *Matter of Vuitton et Fils S.A.,* 606 F.2d 1 (2d Cir. 1979) (writ issued to compel district court to

27   grant a T.R.O. to protect against concealment or destruction of counterfeit goods).

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' EX PARTE APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND OSC RE: PRELIMINARY INJUNCTION

Under Lanham Act section 43(a), which is codified as 15 U.S.C. section 1125(a), it is impermissible to misrepresent or confuse consumers as to the origin or authenticity of products. 15 U.S.C. section 1125(a) provides:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which:
>
> (1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (2) in commercial advertising or promotion misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C.A. §1125(a).

A plaintiff in a § 43(a) case must show "[1] a valid and protectable mark and [2] that Defendant's use of a similar mark is likely to cause confusion." *Creative Tech.*, 1993 WL 603292, at *1; *cf. Dr. Seuss Enterprises L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1403 (9th Cir. 1997), *cert. dismissed*, 521 U.S. 1146 (1997) ("Likelihood of confusion' is the basic test for ... federal statutory trademark infringement."); *and Hotmail Corp. v. Van$ Money Pie Inc.*, No. C 98-20064 JW, 1998 WL 388389, at *4 (N.D. Cal. April 16, 1998) ("The core element of a cause of action for false designation of origin under 15 U.S.C. § 1125(a) as well as other unfair competition is 'likelihood of confusion, i.e. whether the similarity of the marks is likely to confuse customers about the source of the products.' *E. & J Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir. 1992)." (additional citations omitted)).

As mentioned above, the Lanham Act specifically provides that violations of this section may be enjoined. *See* 15 U.S.C. § 1116(a). The following analysis demonstrates that the issuance of a temporary restraining order and a preliminary injunction is particularly appropriate in this case.

**A.    Plaintiffs' Marks Are Valid And Protectable**

Plaintiffs expect that their trademark application will be granted in due course. In the meantime, Plaintiffs are protected under 15 U.S.C. § 1125(a), regardless of whether registrations have issued. The Lanham Act provides protection for trademark owners, even prior to the issuance of a registration certificate for a trademark. *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 n.7 (9th Cir. 1998) ("Registration is not a prerequisite for protection under § 43(a)"); *Creative Tech.*, 1993 WL 603292, at *1 (recognizing that that Lanham Act section 1125(a) protects both registered and unregistered marks). Plaintiffs' "Knukle, Inc.," "Knukle Inc" and "Knukle" trademarks are sufficiently distinctive to obtain trademark protection for the goods set forth in the application. They are strong and arbitrary trademarks.

Plaintiffs developed its "Knukle, Inc." brand in a brainstorming meeting in May 2008. (Grooms' Decl. ¶ 2; Phelan's Decl. ¶ 2). It is not a term that is commonly used in the industry or that, as spelled, can be found in a dictionary. It was coined by Plaintiffs as a unique word that was appealing as a brand name in the clothing industry. As such, the mark is distinctive and protectable under the Lanham Act. In addition, Plaintiffs possess valid common law trademarks in their "Knukle, Inc.," "Knukle Inc" and "Knukle" marks based on the significant first use, advertising and promotion of those marks since at least as early as July 30, 2008. (Grooms' Decl. ¶¶ 13-15 and Exhibits "3", "6" and "7" attached thereto; Phelan's Decl. ¶¶ 9-11). Actual use of a trademark establishes protectable trademark rights under the common law. *See* I J. Gilson, *Trademark Protection and Practice* § 3.02[2] (Matthew Bender & Co. 1999 ed.). On or about July, 2008, Plaintiffs began advertising and promoting its "Knukle, Inc.," "Knukle Inc" and "Knukle" trademarks on its web site at www.knukleinc.com and on Facebook and MySpace pages (Grooms' Decl. ¶¶ 9, 13 and Exhibit "6" attached thereto; Phelan's Decl. ¶ 5 and 9). On or about July 30, 2008, Plaintiffs started distributing business cards, stickers, and other promotional materials

prominently featuring the "Knukle, Inc.," "Knukle Inc" and "Knukle" trademarks. (Grooms' Decl. ¶ 14; Phelan's Decl. ¶ 10). Furthermore, Plaintiffs attended action sports events in Colorado and Southern California promoting the "Knukle, Inc.," "Knukle Inc" and "Knukle" trademarks (Grooms' Decl. ¶ 15 and Exhibit "7" attached thereto; Phelan's Decl. ¶ 11). To date, Plaintiffs have spent approximately $20,000 in marketing and promoting the "Knukle, Inc.," "Knukle Inc" and "Knukle" trademarks. (Grooms' Decl. ¶¶ 2, 5, 9, 10, 14, 16, 34, and 37).

Thus, Plaintiffs already have established protectable trademark rights in both the "Knukle, Inc.," "Knukle Inc" and "Knukle" marks based on its advertising and promotion of those marks since July 2008.

**B.      Defendant's Use Of Plaintiffs' Trademarks Is Likely To Cause Consumer Confusion About The Origin Of The Goods**

Plaintiffs are likely to succeed on the merits of their trademark and unfair competition claims because Defendants used almost the identical "Knukle, Inc.," "Knukle Inc" and "Knukle" marks for a competing line of apparel and accessories targeting mixed martial arts and extreme sports fans in an effort to deceive those consumers into thinking that Defendants' "Knukle, Inc.," "Knukle Inc" and "Knukle" merchandise originated with Plaintiffs.

Section 43(a)(1) of the Lanham Act imposes liability when "[a]ny person ... uses in commerce any word, term, name, symbol, or device, or any combination thereof ... which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1).

In deciding whether there is a likelihood of confusion in violation of Section 43(a)(1), courts may consider the following factors: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark, and (8) likelihood of expansion of the product lines. *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348-49 (9th Cir. 1979).

1    Sometimes courts use a shorter, six-factor test. *Dr. Seuss* Enterprises, 109 F.3d at 1404 n.13
2    (stating the existence of the alternate test); *Hotmail Corp.,* 1998 WL 3S8389, at *4 (naming the
3    elements of the six factor test).However, the Ninth Circuit has pointed out that a plaintiff is not
4    accountable for amassing proof of all of the factors at the early injunction stage. '[I]n granting a
5    preliminary injunction, the parties will not have had a full opportunity to either develop or present
6    their cases and the district court will have had only a brief opportunity to consider the different
7    factors relevant to the likelihood of confusion determination.' The appropriate time for giving full
8    consideration to the factors ... is when the merits of the case are tried. *Apple Computer, Inc. v.*
9    *Formula Int'l, Inc.,* 725 F.2d 521, 526 (9th Cir. 1984) (citations omitted).

10   Applying these factors demonstrates that consumers are likely to be confused as to the
11   source of Defendant's "Knukle, Inc." products and that Defendant deliberately adopted Plaintiffs'
12   "Knukle, Inc.," "Knukle Inc" and "Knukle" marks with little variation to create this confusion.

13   **1.    Strength of the Mark**

14   Plaintiffs' "Knukle, Inc.," "Knukle Inc" and "Knukle" trademarks are strong. The "strength"
15   of a mark varies depending upon whether it is fanciful or arbitrary, suggestive, descriptive, or
16   generic in relation to the goods or services provided under that mark. Generic or descriptive marks
17   are "weak" while fanciful or arbitrary marks are "afforded strong protection." *Jayair v. Muka*
18   *Indus., Inc.,* No. CIV. A. 94-5447 WDK MCX, 1994 WL 744642, *2 (C.D. Cal. Oct. 3, 1994);
19   accord *Ocean Garden, Inc. v. Marktrade Co., Inc.,* 953 F,2d 500, 506 (9th Cir. 1991). In addition, a
20   company's extensive advertising and public recognition strengthen its trademarks. *Ocean Garden,*
21   953 F.2d at 600; *Hotmail Corp.,* 1998 WL 388389, at *4.

22   Plaintiffs' "Knukle, Inc.," "Knukle Inc" and "Knukle" marks are arbitrary or fanciful with
23   respect to the merchandise provided under those marks. The misspelled word "Knukle" does not
24   exist in the English language. It is also not a term that is commonly used in the action sports
25   industry. "Knukle, Inc.," "Knukle Inc" and "Knukle" are simply fanciful and arbitrary marks that
26   are used to identify Plaintiffs as the source of the "Knukle, Inc.," "Knukle Inc" and "Knukle"
27   merchandise. Thus, the trademarks are unique with respect to Plaintiffs' clothing merchandise and

28

should be afforded strong protection. Moreover, as mentioned above, Plaintiffs have been advertising and promoting its trademarks since July, 2008 and have invested over $20,000 in its "Knukle, Inc.," "Knukle Inc" and "Knukle" trademarks since that time. As a result, Plaintiffs have developed partnerships with designers, manufacturers, distributors, suppliers, and consumers who have all come to recognize the "Knukle, Inc.," "Knukle Inc" and "Knukle" trademarks as identifying Plaintiffs as the source of "Knukle, Inc.," "Knukle Inc" and "Knukle" apparel. Thus, the strength of Plaintiffs' trademarks favors granting Plaintiffs relief.

## 2.    Proximity of the Goods

Both Plaintiffs' and Defendants' goods are lines of apparel and accessories used for identical purposes, and the products are directly competitive with one another. Both Plaintiffs' "Knukle, Inc.," "Knukle Inc" and "Knukle" merchandise and Defendants' "Knukle, Inc.," "Knukle Inc" and "Knukle" merchandise are wearing apparel that is marketed to fans of the action sports industry. Based upon a review of the merchandise advertised for sale on Plaintiffs' former web site, www.knukleinc.com, as compared to the merchandise advertised for sale on Defendants current website, www.knukleinc.com, (which the latter now control), the purpose, function, and design of the "Knukle, Inc.," "Knukle Inc" and "Knukle" trademarks and merchandise are nearly identical to Plaintiffs' "Knukle, Inc.," "Knukle Inc" and "Knukle" trademarks and merchandise and are clearly confusing and have caused significant actual confusion to the public. (Grooms' Decl. ¶¶ 54-58 and Exhibits "25" and "29" attached thereto).

Clearly, Plaintiffs' products provide the same function to customers and comprise the same designs that Defendants currently market and distribute to the public. The proximity of the parties' goods is as close as can be imagined.

## 3.    Similarity of the Marks

Regarding similarities between marks with respect to sight, sound and meaning, Defendants' marks "Knukle, Inc.," "Knukle Inc" and "Knukle" incorporate Plaintiffs' "Knukle, Inc.," "Knukle Inc" and "Knukle" trademarks in their entirety; except the second "k" in the term "Knukle" is flipped from backwards to forwards. The "Knukle" portion of Defendants' marks are

1 spelled the same and sound the same as Plaintiffs' "Knukle, Inc.," "Knukle Inc" and "Knukle"

2 trademarks. Defendants' insertion of a forwards "k" does not alter the pronunciation of the mark,

3 only its visual appearance. Even viewing Defendant's mark in its entirety, as "Knukle, Inc.,"

4 "Knukle Inc" and "Knukle", and comparing it to Plaintiffs' "Knukle, Inc.," "Knukle Inc" and

5 "Knukle" trademarks, demonstrates that the inclusion of a flipped "k" is not sufficient to eliminate

6 consumer confusion.

7        Furthermore, by Defendants' appropriating Plaintiffs' website to advertise all of the same

8 products and designs developed and used by Plaintiffs,  Defendants have appropriated Plaintiffs'

9 tangible and intangible personal property with only a feeble attempt to distinguish itself by flipping

10 the letter "k" in Plaintiffs' "Knukle, Inc.," "Knukle Inc" and "Knukle" marks. When viewed in their

11 entireties, Defendants' uses and misappropriations of Plaintiffs' "Knukle, Inc.," "Knukle Inc" and

12 "Knukle" trademarks, the "Knukle, Inc." tradename, the www.knukleinc.com website, and all of

13 Plaintiffs' designs for its "Knukle, Inc.," "Knukle Inc" and "Knukle" merchandise, it is apparent

14 that Defendants have committed numerous acts of unfair competition using similar marks to

15 Plaintiffs, and that Defendants' conduct is likely to cause consumer confusion.

16        **4.        Evidence of Actual Confusion**

17        Actual confusion is not necessary to finding 43(a) liability, but where present, it is

18 strongly indicative of liability. *See Jayair,* 1994 WL 744642, at *4 ("Because evidence of actual

19 confusion is often difficult to obtain, the absence of such evidence is not dispositive." (citation

20 omitted)). On or about January 29, 2009, Mr. Grooms first received a MySpace post from a

21 representative from a retailer named "Skin" based out of El Cajon, California explaining how nice

22 it was to meet "Knukle, Inc." representatives during the ASR trade show, and that Skin had

23 billboard space for "Knukle, Inc." designs near their store that had freeway frontage. (Grooms'

24 Decl. ¶ 54 and Exhibit "25" attached thereto. ) On or about February 5, 2009, Mr. Grooms received

25 an e-mail from a representative of a retailer based in Bakersfield named, "Fatal Impact," who stated

26 that he was excited to receive his shipment of new "Knukle, Inc." apparel. (Grooms' Decl.  ¶ 58

27 and Exhibit "29" attached thereto.) On or about March 8, 2009, Plaintiffs received a MySpace post

28

from "Fatal Impact" requesting a status update of the "Knukle" clothing shipment that they were expecting. (Grooms' Decl.   ¶ 58 and Exhibit "29" attached thereto.)   Plaintiffs anticipate that discovery will uncover more evidence of actual confusion by customers, retailers, suppliers, and Internet users.

### 5.      Marketing Channels Used

The marketing channels through which Plaintiffs and Defendants sell their products are identical. Defendants compete directly with Plaintiffs for customers via the Internet; in fact, Defendants appropriated Plaintiffs' website www.knukleinc.com after the rift between the parties became too large to mend. Moreover, Defendants sell their goods at many of the events and venues as Defendants; including the ASR trade show that Defendants attended solely by locking out Plaintiffs before the event. Defendants compete with Plaintiffs to sell their merchandise to the same end-users. (Grooms' Decl. ¶¶ 44, 53, 55 and Exhibit "26" attached thereto; Phelan's Decl. ¶¶ 37, 43-44).

Hence, the marketing approaches and channels are virtually the same, strongly supporting a finding that there is a likelihood of confusion.

### 6.      Type Of Goods And Degree Of Care Likely To Be Exercised By The Purchaser

The degree of care test is a factor that is not included in the alternate six-factor test sometimes used in this Circuit (*Hotmail, supra*), and at this preliminary stage, Plaintiffs have yet to investigate this factor. Here, Plaintiffs' and Defendants' merchandise perform the same function, use the same "Knukle, Inc.," "Knukle Inc" and "Knukle" marks, and will be sold at comparable prices. Plaintiffs are not required to amass all of the evidence required to establish likelihood of confusion at the preliminary injunction stage. *Apple Computer,* 725 F.2d at 526. However, the similarities between the Plaintiffs and Defendants are so substantial that, when marketed under similar trademarks, consumers are likely to be confused.

////

////

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND OSC RE: PRELIMINARY INJUNCTION

### 7.   Defendant's Intent In Selecting The Mark

"When one party knowingly adopts a mark similar to another's, reviewing courts presume that the Defendant will accomplish its purpose, and that the public will be deceived." *Academy of Motion Picture Arts and Sciences v. Creative House Promotions,* 944 F.2d 1446, 1456 (9th Cir. 1991). "Thus, where evidence shows that one company deliberately adopted another's name to obtain advantage from the other's goodwill, we may infer a likelihood of confusion." *Id.*

There is abundant evidence of Defendants' bad faith. First, Defendants formed Knukle Two without Plaintiffs' knowledge or consent. Second, Defendants duped Plaintiffs into turning over their control of the www.knukleinc.com website. Third, Defendants flaunted the fact that, during the parties' fall out, Defendants planned on forming a new company by appropriating all of Plaintiffs' personal property related to the "Knukle, Inc.," "Knukle Inc" and "Knukle" trademarks, designs, and trade name for the purpose of advertising and selling "Knukle, Inc.," "Knukle Inc" and "Knukle" merchandise, and in fact, did exactly that. Fourth, Defendants filed fraudulent trademark applications with the USPTO with false dates of first use before the Defendants ever met Plaintiffs or the name was used in commerce. This was all done in a clear effort to mislead and deceive consumers at the ASR trade show and in general with respect to the origin of Defendants' merchandise. As mentioned above, the words "Knukle, Inc.," "Knukle Inc" and "Knukle" have no meaning in the industry or with respect to the goods at issue except to identify Plaintiffs as the source of the "Knukle, Inc.," "Knukle Inc" and "Knukle" merchandise. Thus, Defendant's inclusion of Plaintiffs' entire "Knukle, Inc.," "Knukle Inc" and "Knukle" trademarks in Defendant's nearly identical merchandise is no coincidence. Defendants adopted the competing and similar marks in an attempt to benefit from the investments and goodwill that Plaintiffs have built up in their "Knukle, Inc.," "Knukle Inc" and "Knukle" trademarks, and the "Knukle, Inc." tradename. This is further evidenced by Defendants' misappropriation of Plaintiffs' entire "Knukle, Inc.," "Knukle Inc" and "Knukle" trademarks and line of apparel and accessories on Defendants' website misappropriated from Plaintiffs. Obviously, Defendants could have chosen from countless other non-infringing words in selecting a name for its merchandise. Instead, Defendants chose a mark that is virtually

1 identical in sight and sound to Plaintiffs' "Knukle, Inc.," "Knukle Inc" and "Knukle" marks. Thus,

2 the only reasonable explanation for Defendants' choice is that Defendants are deliberately

3 attempting to confuse consumers and to capitalize on Plaintiffs' goodwill in order to increase sales

4 of their own competing merchandise and sabotage Plaintiffs' efforts.

5 **8.      Likelihood Of Expansion Of The Product Lines**

6 Because the merchandise at issue is so similar, it is not necessary to consider whether the

7 parties' merchandise is likely to expand and overlap in the future; it already overlaps. One need

8 only look at the purpose, function, designs, and overall appearance of Defendants' merchandise as

9 it is described on the www.knukleinc.com website currently controlled by Defendants to see that it

10 is virtually identical to Plaintiffs' "Knukle, Inc.," "Knukle Inc" and "Knukle" merchandise.

11 Accordingly, considering the strength of Plaintiffs' "Knukle, Inc.," "Knukle Inc" and

12 "Knukle" marks, the prior advertising and promotion as well as consumer recognition of Plaintiffs'

13 merchandise, Defendants' misappropriation and incorporation of Plaintiffs' entire "Knukle, Inc.,"

14 "Knukle Inc" and "Knukle" marks into Defendants' "Knukle, Inc.," "Knukle Inc" and "Knukle"

15 marks, merchandise and website, the similarity of the goods and distribution channels, the

16 inferences and realities of Defendants' intentions and the evidence supporting the other likelihood

17 of confusion factors set forth above, there is no question that the Defendants are attempting to

18 benefit from Plaintiffs' goodwill by creating consumer confusion. Thus, it is likely that Plaintiffs

19 will prevail on its claim under § 43(a) of the Lanham Act.

20 **V.      Plaintiffs Will Suffer Irreparable Harm in the Absence of Equitable Relief**

21 The basis for injunctive relief in California federal courts is irreparable harm and the

22 inadequacy of legal remedies. *Stanley v. University of Southern California*, 13 F.3d 1313, 1320 (9th

23 Cir. 1994) citing *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-507 (1959). Once the

24 plaintiff establishes a reasonable likelihood of success on the merits, courts in recent history have

25 presumed irreparable injury from a showing of likelihood of success in a trademark case. *E.g.*

26 *Columbia Pictures Indus., Inc. v. Miramax Films Corp.*, 11 F. Supp. 2d 1179, 1184 (C.D. Cal.

27 1998) (In "'trademark cases, irreparable injury is presumed upon a showing of likelihood of

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' EX PARTE APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND OSC RE: PRELIMINARY INJUNCTION

1  success.' *Dr. Seuss Enter. L.P. v. Penguin Books USA, Inc.,* 924 F. Supp. 1559, 1574 (S.D. Cal.
2  1996), *aff'd,* 109 F.3d 1394 (9th Cir.), *cert. dismissed,* --- U.S. ---, 118 S. Ct. 27, 138 L. Ed. 2d
3  1057 (1997).") To the extent that this Court is concerned that the Supreme Court's recent holding in
4  a patent case, *eBay Inc. v. MercExchange, L.L.C.,* 547 US 388, 391-392 (2006), calls that
5  presumption in a trademark case into question, it is clear in our case that Plaintiffs will suffer
6  irreparable harm if Defendants are not enjoined from further acts of trademark infringement and
7  unfair competition. If an injunction were denied, Plaintiffs would be forced to sit by and watch
8  Defendants dupe the consuming public, continue to violate the law, and infringe upon Plaintiffs'
9  rights while putting Plaintiffs' reputation, trademarks, trade name, and goodwill in Defendants'
10 hands; harms that would be difficult to measure and impossible to undo. In addition, as evidenced
11 by Defendants prior deceptive acts, and their recent posting on www.craigslist.com seeking further
12 investment to fill existing orders for "Knukle, Inc." merchandise, the likelihood that Defendants
13 may be insolvent, that further public investors could be treated like Plaintiffs were or duped by
14 Defendants into investing in a company and individuals that are unlawfully conducting their
15 business, or that Defendants will attempt to dissipate assets by secret transfers to unknown alter
16 egos, affiliates and agents to avoid judgment, warrant that this Court should, to avoid irreparable
17 harm to Plaintiffs, grant the requested TRO and preliminary injunction.

18 **VI.    Plaintiffs Will Likely Succeed On Their Claims For Unfair Competition Under California Business & Professions Code Section 17200 et seq.**

19      California Business & Professions Code section 17200 provides:
20
21      *As used in this chapter, unfair competition shall mean and include any unlawful, unfair or*
22      *fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising*
23      *and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division*
24      *7 of the Business and Professions Code. Cal. Bus. & Prof. Code § 17200.*
25      An action for unfair competition under California Business & Professions Code § 17200 is
26 "substantially congruent" to a trademark infringement claim under the Lanham Act. The test is
27 whether the public is likely to be deceived or confused by the similarity of the marks. *See Academy*
28 *of Motion Picture Arts,* 944 F.2d at 1457.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' EX PARTE APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND OSC RE: PRELIMINARY INJUNCTION

Defendants' conduct described above demonstrates how the public has been and is likely to be deceived or confused by the similarity of Defendants' "Knukle, Inc.," "Knukle Inc" and "Knukle" marks and "Knukle, Inc." trade name and Plaintiffs' "Knukle, Inc.," "Knukle Inc" and "Knukle" marks and "Knukle, Inc." trade name. As such, Defendants' conduct constitutes unlawful, unfair and fraudulent business acts which violate California Business & Professions Code § 17200. Section 17203 specifically authorizes injunctive relief.

## VII.    Plaintiffs Are Likely To Succeed on Their Claims for Tortious Interference with Prospective Economic Advantage

In addition to finding that Plaintiffs are likely to succeed on its trademark and unfair competition claims, the Court should grant Plaintiffs relief based upon Defendants' tortious interference with Plaintiffs' prospective economic advantage.

An action for tortious interference with prospective economic "will lie where the right to pursue a lawful business, calling, trade, or occupation is intentionally interfered with either by unlawful means or by means otherwise lawful when there is a lack of sufficient justification." *Willis v. Santa Ana etc. Hospital Assn.*, 58 Cal. 2d 806, 810 (1962), *overruled on other grounds in Cianci v. Superior Court,* 40 Cal. 3d 903 (1985).

Here, Defendants' misappropriation of Plaintiffs tangible and intangible property and their use of the confusingly similar "Knukle, Inc.," "Knukle Inc" and "Knukle" trademarks, and the "Knukle, Inc." trade name was deliberately calculated to interfere with Plaintiffs' business opportunities and, specifically, to interfere with Plaintiffs' prospective customers. Defendants knew that Plaintiffs had created and been promoting the "Knukle, Inc.," "Knukle Inc" and "Knukle" trademarks under the "Knukle, Inc." tradename with customers as they were intimately involved in Plaintiffs' business before their departure from Plaintiffs' "Knukle, Inc." enterprise. Rather than focusing their efforts on creating  unique trademarks of their own, Defendant intentionally acted to deceive consumers into believing Defendants (not Plaintiffs) was the source of "Knukle, Inc.," "Knukle Inc" and "Knukle" apparel and accessories. In doing so, Defendant intentionally interfered with Plaintiffs' right to pursue a lawful business. Plaintiffs have been, and will continue to be, harmed by Defendants' tortious conduct unless Defendants are immediately enjoined.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND OSC RE: PRELIMINARY INJUNCTION

**VIII.   Plaintiffs Are Likely To Succeed on Their Claims for Conversion**

To succeed on a claim for conversion under California law, Plaintiffs must demonstrate (1) their ownership or right to possess certain property; (2) Defendants' wrongful disposition of Plaintiffs' rights to that certain property; and (3) damages. *See G.S. Rasmussen & Associates., Inc. v. Kalitta Flying Service, Inc.,* 958 F.2d 896, 906 (9th Cir. 1992).

It is indisputable that Plaintiffs own, either in whole or in part, the property that Defendants took from Plaintiffs. Defendants wrongfully appropriated for themselves Plaintiffs' website, trademarks, trade name, and merchandise in violation of Plaintiffs' property rights and used this property for their own advantage and Plaintiffs' detriment. Plaintiffs have suffered irreparable harm and will continue to do so if Defendants are permitted to keep and use Plaintiffs' property.

**IX.   Plaintiffs Are Likely To Succeed on Their Claims for Cybersquatting**

Defendants, with demonstrable bad intent, have committed cyberpiracy by registering, trafficking, and/or using Plaintiffs' "www.knukleinc.com" domain name that, as described above, is identical and confusingly similar to the one purchased by Mr. Grooms in May 2008. Defendants' bad intent is demonstrable by their conversion of Plaintiffs' "www.knukleinc.com" domain name, and their use of similar images containing Plaintiffs' "Knukle, Inc.," "Knukle Inc" and Knukle trademarks. (Grooms' Decl. ¶¶ 53-59). This is causing potential and actual clients of Plaintiffs to be misdirected and confused into visiting Defendants' competing website. (See id.).

**X.   The Balance Of Harm Favors Issuing An Immediate Injunction**

Defendants' continued use of Plaintiffs' reputation, trademarks, trade name, and goodwill will destroy those things which Plaintiffs have worked so hard to develop; harm that would be impossible to undo. In addition, as evidenced by Defendants prior deceptive acts, and their recent use of Plaintiffs' website www.knukleinc.com, posting on www.craigslist.com seeking further investment to fill existing orders for "Knukle, Inc." merchandise, the likelihood that Defendants may be insolvent or that Defendants will attempt to dissipate assets by secret transfers to unknown alter egos, affiliates and agents to avoid judgment warrant that this Court should, to avoid irreparable harm to Plaintiffs, grant the requested TRO and preliminary injunction. In contrast to

1  the irreparable harm that will be caused to Plaintiffs by Defendants' wrongful conduct, the potential

2  harm to Defendants if an immediate injunction is entered is nonexistent or can be eliminated by

3  carefully drafting a TRO or preliminary injunction.

4          Defendants' use of an infringing mark, such as "Knukle", is not legally recognized as an

5  injury. *E.g. Hotmail,* 1998 WL 388389, *8 ("if enjoined, defendants would not suffer harm in that

6  they would be free to continue advertising by means of e-mail so long as they did not use

7  [plaintiff's] mark or services to facilitate such advertising. Thus, the balance of hardships strongly

8  tips in favor of plaintiff."); *see Cadence Design Systems, Inc. v. Avant! Corp.,* 125 F.3d 824 (9th

9  Cir. 1997) (in a Copyright case, "'[w]here the only hardship that the defendant will suffer is lost

10  profits from an activity which has been shown likely to be infringing, such an argument in defense

11  "merits little equitable consideration.'" (citations omitted and emphasis added]).

12          In short, the irreparable harm that Plaintiffs will sustain absent a temporary restraining order

13  and preliminary injunction far outweighs any inconvenience that Defendants will experience if they

14  are required to stop any infringement of Plaintiffs' marks. While Plaintiffs are likely to prevail,

15  given that the balance of hardships strongly favors Plaintiffs, this Court should grant the TRO and

16  Preliminary Injunction even if the Court finds only serious questions going to the merits of

17  Plaintiffs' trademark claims (as opposed to a likelihood of success on the merits).

18  **XI.   The Bond Amount Should Be Small**

19          In construing the language of Federal Rule of Civil Procedure 65(c), the courts have stated

20  that, "especially in view of the phrase - 'as the court deems proper' - the district court may dispense

21  with security" where the district court determines that the risk of harm is remote, or that the

22  circumstances otherwise warrant it, or that there has been no proof of likelihood of harm to the

23  party enjoined. The Court has the discretion to require only a nominal bond, or even no bond at all.

24  *See, e.g., Int'l Controls Corp. v. Vesco,* 490 F.2d 1334, 1356 (2d Cir. 1974) (approving district

25  court's fixing bond amount at zero in the absence of evidence regarding likelihood of harm). Based

26  on the above, including the fact that injunctive relief will not cause any legally recognizable

27  economic or other harm to Defendants, it is respectfully requested that the Court require that

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' EX PARTE APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND OSC RE: PRELIMINARY INJUNCTION

1 | Plaintiffs post no bond, or, at most, only a nominal bond in connection with the requested injunctive
2 | relief.

3 | **XII.   Plaintiffs Request Expedited Discovery**

4 | In determining whether a party is entitled to conduct expedited discovery, courts have
5 | employed an injunction-style analysis of the relevant factors discussed in detail above. *Yokohama*
6 | *Tire Corporation v. Dealers Tire Supply, Inc.,* 202 F.R.D. 612, 613 (D. Ariz. 2001). Expedited
7 | discovery is important to determine, at minimum, the identity of any distributors and offending
8 | parties, identity of any purchasers, number of purchase orders, amount of merchandise ordered, and
9 | amount of anticipated accounts receivables. If Plaintiffs are not granted expedited discovery, they
10 | will suffer irreparable injury. As Plaintiffs' should be entitled to injunctive relief for all of the
11 | foregoing reasons, Plaintiffs should also be entitled to expedited discovery to be best prepared for
12 | the imminent preliminary injunction hearing to follow.

13 | **XIII.   Conclusion**

14 | For the reasons set forth above, Plaintiffs ask this Court to grant them a Temporary
15 | Restraining Order and an Order To Show Cause Re: a Preliminary Injunction.

16 | Respectfully Submitted,

18 | DATED: MArch 10, 2009

CATALYST LAW GROUP

Christopher Villasenor
Attorney for Plaintiffs
JAMES GROOMS, BRYCEMARIE PHELAN and
KNUKLE, INC., A COLORADO CORPORATION

Page 20