# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES GROOMS; BRYCEMARIE PHELAN; KNUKLE, INC., a Colorado corporation,<br><br>                               Plaintiffs,<br>     vs.<br><br>JOHN LEGGE; GWEN LEGGE; KNUKLE, INC., a California corporation; ARTILLERY DISTRIBUTION; SEAN MYERS; DEVIN MERCADO; DOES 1-50,<br><br>                               Defendants. | CASE NO. 09cv489 - IEG - POR<br><br>ORDER ON PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER |

On March 11, 2009, plaintiffs filed a complaint and an application for a temporary restraining order. (Doc. Nos. 1, 4.) The Court heard oral argument on March 16, 2009 at 10:30 a.m., but defendants failed to appear. After consideration of the plaintiffs' submissions, and for the reasons set forth below, the Court GRANTS plaintiffs' application for a temporary restraining order.

## BACKGROUND

**A.    The Parties**

Plaintiffs James Grooms and Brycemarie Phelan are individuals residing in Colorado. Plaintiff Knukle, Inc. ("Knukle One") is a Colorado corporation with its principal place of business in Colorado Springs, Colorado. Knukle One was incorporated on November 28, 2009, but began as an unincorporated business entity in May 2008.

Defendants John Legge and Gwen Legge (collectively the "Legges") are a married couple

living in Orange County, California. The Legges are part owners of defendant Knukle, Inc. ("Knukle Two"), a California corporation formed on September 19, 2008 with a principal place of business in Orange County, California.

Knukle Two may be partially owned by defendant Artillery Distribution, an unknown business entity with a principal place of business in San Diego, California. Defendants Sean Myers and Devin Mercado own and operate Artillery Distribution, which is a graphic design company.

**B.     Factual Background**

i.      Formation

In May 2008, Grooms and Phelan created the name "Knukle Inc" ("Knukle" was deliberately misspelled by omitting the "c" and turning the second "k" backwards). They created the name and some initial drawings, which combined the name Knukle Inc and a symbol representing brass knuckles. The name and these drawings became the genesis of a line of apparel and accessories targeted at fans of extreme sports and mixed martial arts. Grooms and Phelan reserved the domain name www.knuckleinc.com ("Knukle website") using an internet provider www.1and1.com.

On June 12, 2008, Grooms and Phelan filed a federal "intent to use" trademark application for the mark "Knukle" (with the second "k" turned backwards), serial number 77497169.

On July 8, 2008, after contacting various other vendors, Grooms and Phelan approached Artillery Distribution, asked for its assistance refining the Knukle designs, and requested estimates for printing designs on apparel and accessories. Over the phone, Grooms informed defendants Myers and Mercado of his trademark application and his intent to form the company "Knukle Inc."

During July 2008, Grooms and Phelan acted to establish Knukle Inc. They ordered business cards, established a merchant services account with Wells Fargo, and created Facebook and MySpace pages.[1] Additionally Grooms, Phelan, Myers, and Mercado attended the X-games in Long Beach and distributed promotional "Knukle, Inc" apparel to event attendees.[2] On August 7, 2008, Grooms and Phelan made their first internet sale of Knukle Inc apparel.

---

[1] "Facebook" and "MySpace" are social networking sites which allow users to create profiles with information about the user or her business.

[2] The "X-games" is an annual event with a focus on extreme sport action, such as skateboarding and BMX biking.

ii.     The Business Relationship

During late August or early September of 2008, Grooms and Phelan placed an advertisement on www.craigslist.com, seeking investors for Knukle.[3] On September 9, 2008, Gwen Legge contacted Grooms and Phelan and expressed interest in investing in Knukle Inc.  Grooms, Phelan, and the Legges agreed to meet on September 13, 2008.

On September 13, 2008, plaintiffs met with all defendants at a restaurant in Dana Point, California.  Grooms and Phelan brought sample Knukle Inc apparel to the meeting.  The Legges orally agreed to invest $115,000, up-front, in exchange for 50% ownership of "Knukle Inc." On September 16, 2008, Grooms drafted an email memorializing the oral agreement between the Legges, Grooms, and Phelan.  This included a schedule of costs provided by Artillery Distribution.

After this meeting, John Legge established independent contact with Myers of Artillery Distribution.  Together, John Legge and Myers informed Grooms they needed to change the Knukle website's webhost from Dreyson Solana to Bluehost in order to improve the site.  Grooms agreed to the changes, but did not know the domain name was transferred to John Legge.

On September 19, 2008, unbeknownst to plaintiffs, the Legges formed Knukle Two.  During preparation for the Action Sports Retailers trade show ("ASR trade show") scheduled for January 2009, John Legge began meeting with Myers and Mercado without consulting Grooms or Phelan. On November 5, 2008, Gwen Legge told Grooms that the Legges had opened a merchant account. Grooms understood the Legges would need an Employer Identification Number (EIN) to open that account.  When he inquired about the EIN, Gwen claimed the Legges were only *thinking* about opening a merchant account.  At this point, Grooms and Phelan became nervous about the actions the Legges had taken.  On November 28, 2008, Grooms formed Knukle One, a Colorado corporation.

iii.    The Fracture of the Relationship

On December 16, 2008, Gwen Legge called Grooms to request that he and Phelan assign to her their individual interests in the Knukle marks.  Further, she requested Grooms and Phelan agree to move the company headquarters to Orange County, California.   Grooms declined both requests.

---

[3] "Craigslist.com" is a free website which is equivalent to an online classified advertisement section of a newspaper.

Later that evening, Myers and Mercado called Grooms and informed him that the Legges were covertly starting their own company around a line of apparel targeting fans of extreme sports and mixed martial arts. The Legges planned to market the apparel at the ASR trade show with the brand name "Knukle Inc" (with the second "k" turned forwards) (the "Knukle Two mark").

Still later on December 16, 2008, Grooms called John Legge to express his concern about the phone call he received from Artillery Distribution. Grooms explained that if the Legges left the company, they could not use the name "Knukle." John Legge replied with vulgarity and expletives. Grooms offered to assign his and Phelan's rights to the trademarks if he and Phelan retained 51% of the company. The Legges did not agree to those terms. Later that night, during a subsequent phone call, John Legge offered to allow Grooms and Phelan to buy him out for 120% of the initial investment. The following day, Grooms and Phelan offered to buyout the Legges for a percentage less than 120%, but John Legge said buyout was no longer an option.

On December 18, 2008, Knukle Two filed a federal "actual use" trademark application for the mark, "Knukle Inc" with the second "k" turned forwards, Serial Number 77636449. Knukle Two subsequently amended the filing basis to "intent to use" on March 4, 2009. On January 5, 2009, Knukle Two filed a second federal "actual use" trademark application under a different International Class. In these two applications, the Legges claim a first date of use as June 1, 2008 – a claim plaintiffs assert is impossible.

On January 22-24, 2009, the Legges sent Myers and Mercado to the ASR trade show to procure orders for the sale of "Knukle Inc." designs and merchandise. This merchandise was obtained from Artillery Distribution and Abstrakt Printing. Plaintiffs did not attend the ASR show because Artillery Distribution released all of the "Knukle, Inc." merchandise to the Legges. Further, a trade show representative informed Grooms that only the Legges were allowed to attend the show.

On January 30, 2009, Grooms noticed a new website had been posted at www.knukleinc.com. Grooms was unable to log onto the website as the site owner. At that time, Grooms noticed the Knukle Inc Facebook and MySpace pages began receiving postings calling Grooms and Phelan imposters. These postings contained information that could only be known by someone with intimate

knowledge of the business relationship between the parties.

On February 5, 2009, Grooms received an email from a representative retailer based in Bakersfield named "Fatal Impact." Fatal Impact stated he was excited to receive his shipment of new "Knukle, Inc." apparel. Grooms and Phelan never received an order from Fatal Impact. Fatal Impact requested a status update via MySpace on March 8, 2009. Further, a retailer named "Skin" posted a MySpace message stating he enjoyed meeting Knukle representatives. Skin had only meet defendants' representatives.

On February 10, 2009, Grooms contacted Don Petro of Big League Graphics to fill an order. Petro contacted Independent Trading Company, a blank sweatshirt wholesaler. Independent Trading Co. informed Petro that an order from "Knukle, Inc" had already been made for a design "Knukle Up." The order was for more than $200,000 of sweatshirts imported from China.

Since the dissolution of the business relationship, Knukle Two has promoted its product using the Knukle Two mark and the Knukle website. In the exhibits attached to the Grooms Declaration, plaintiffs catalogue how defendants are selling exact replicas of plaintiffs' products and mark; the only difference is the orientation of the second "k" in Knukle. See (Grooms Decl., Ex. 26-1 though 26-44.) In each of these situations, the mark is presented on the same color merchandise, written in the same font, written in the same color, and accompanied by the same designs and symbols.

**C.   Procedural Background**

Plaintiffs filed a complaint alleging fifteen claims for relief: (1) unfair competition and false designation of origin of goods under 15 U.S.C. §1125; (2) cybersquatting, in violation of 15 U.S.C. § 1125(d); (3) violations of California Business & Professions Code §§ 17200, 17500; (4) unfair competition under California's common law; (5) trademark and trade name infringement; (6) conversion; (7) fraud; (8) intentional interference with prospective business advantage; (9) intentional interference with economic relationships; (10) defamation; (11) breach of oral/implied contract; (12) civil conspiracy; (13) declaratory relief; (14) accounting; and (15) constructive trust/ equitable lien.

In their TRO application, plaintiffs request a series of prohibitory injunctions and mandatory injunctions. Plaintiffs request the court prohibit defendants from: (1) holding themselves out as rightful owners of "Knukle, Inc." enterprise; (2) asserting ownership rights and control over plaintiffs'

1 property and intellectual property rights including the trademarks "Knukle Inc," "Knukle, Inc.,"and
2 "Knukle"(collectively "Knukle mark") and the domain name/website www. knukleinc.com ("Knuckle
3 website"); (3) using the Knukle marks in commerce; (4) using "Knukle Inc," "Knukle, Inc.,"and
4 "Knukle" trade names in commerce; (5) using the domain name and Knukle website; (6) using
5 photographs, graphics, and designs bearing the Knukle marks in advertising; (7) marketing, selling,
6 distributing any clothing, merchandise, or accessories bearing the Knukle marks; and (8) operating
7 Knukle Two to compete with Knukle One.

8 Plaintiffs also request the following mandatory injunctions, directing defendants to: (1) place
9 all funds and accounts receivable from the sale of clothing, merchandise, and accessories bearing the
10 Knukle marks in a Court controlled account; and (2) transfer ownership and control of the domain
11 name/website www.knukleinc.com to plaintiffs.

12 Finally, plaintiffs request expedited discovery. Plaintiffs seek permission to issue form
13 interrogatories, document requests, and up to three depositions prior to the preliminary injunction.

### LEGAL STANDARD

15 When pursuing an injunction, all courts agree a plaintiff must show "irreparable injury" and
16 that legal remedies are "inadequate." Arcamuzi v. Continental Air Lines, Inc., 819 F.2d 935, 937 (9th
17 Cir. 1987). However, the Ninth Circuit uses two alternative tests to evaluate the propriety of a
18 temporary restraining order or a preliminary injunction. Under the "traditional test," courts implement
19 four factors to evaluate the application:

> (1) the likelihood of the moving party's success on the merits; (2) the possibility of irreparable injury to the moving party if relief is not granted; (3) the extent to which the balance of hardships favors the respective parties; and (4) in certain cases, whether the public interest will be advanced by granting the preliminary relief.

23 Owner Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co., Inc., 367 F.3d 1108, 1111 (9th Cir.
24 2004). Alternatively, courts require the moving party to "demonstrate either (a) probable success on
25 the merits combined with the possibility of irreparable injury or (b) that she has raised serious
26 questions going to the merits, and that the balance of hardships tips sharply in her favor." Bernhart
27 v. County of Los Angeles, 339 F.3d 920, 925 (9th Cir.2003). These are not two separate tests, but
28 rather two points on a sliding scale in which the required showing of harm varies inversely with the

1  required showing of meritoriousness. Clear Channel Outdoor Inc. v. City of Los Angeles, 340 F.3d
2  810, 813 (9th Cir. 2003). Because a preliminary injunction is an extraordinary remedy, the movant
3  must carry its burden of persuasion by a "clear showing." Mazurek v. Armstrong, 520 U.S. 968, 972
4  (1997). Mandatory injunctions are "subject to a heightened scrutiny and should not be issued unless
5  the facts and law *clearly favor* the moving party." Dahl v. HEM Pharmaceuticals Corp., 7 F.3d 1399,
6  1403 (9th Cir. 1993) (emphasis added).

## DISCUSSION

**A.    Likelihood of Success on the Merits**

*1.    Lanham Act Origin of Goods Claim*

i.    Plaintiffs' Arguments

Plaintiffs argue they are likely to succeed on the merits of their Lanham Act claim because defendants' use of the Knukle Two mark is likely to cause consumer confusion as to the origin of goods. Plaintiffs note, to prove a Lanham Act origin of goods claim, a plaintiff must show "[1] a valid and protected mark and [2] that Defendant's use of a similar mark is likely to cause confusion." Creative Tech., Ltd. v. SRT, Inc., 1993 WL 603292 at *1 (N.D. Cal. November 8, 1993).

Plaintiffs claim the Knukle mark is valid and protected, even though it is not a registered mark, because they possess a valid common law trademark, citing Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery, 150 F.3d 1042, 1047 n. 7 (9thc Cir. 1998); Creative Tech, 1993 WL 603292 at *1.; and 1 J. Gilson, Trademark Protection and Practice § 3.02[2] (Matthew Bender 1999 ed.).

Plaintiffs claim the defendants use of a similar mark is likely to cause confusion because defendants are using an almost identical "Knukle, Inc." mark for a competing line of apparel and accessories targeted at fans of extreme sports. Plaintiffs note the Ninth Circuit uses eight factors to determine the likelihood of confusion: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. AMF Inc. v. Sllekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979).

Plaintiffs address these elements in order. First, plaintiffs argue the mark is strong because

1  it is arbitrary or fanciful.  Second, plaintiffs argue the proximity of the goods favors injunction
2  because, as direct competitors, the parties' goods are used for identical purposes and marketed to the
3  same audience.  Third, plaintiffs argue the marks are similar, with the only difference being the
4  orientation of the second "k" in the word "Knukle."  Fourth, plaintiffs argue there has been actual
5  confusion: a retailer named "Skin" wrote a MySpace post mistaking defendants' representatives for
6  Knukle One representatives; and a retailer named "Fatal Impact" mistakenly sent emails to plaintiffs
7  to discuss his order of defendants' merchandise.  Fifth, plaintiffs note the parties use identical
8  marketing channels to sell their products.  Sixth, plaintiffs have not investigated the degree of care.
9  Seventh, plaintiffs assert defendants selected the mark in bad fath with the purpose of confusing
10 consumers and coopting the Knukle Inc marks.  Eighth, plaintiffs assert there is no need to explore
11 the likelihood of expansion because the product lines already directly overlap.

ii.  Analysis

A plaintiff may show that it is likely to succeed on the merits of its trademark infringement claim under the Lanham Act by establishing that (1) it has a "valid, protectable trademark," and (2) defendant's "use of the mark is likely to cause confusion." See Applied Info. Sciences Corp. v. eBay, Inc., 511 F.3d 966, 969 (9th Cir.2007).

First, plaintiffs must show a likelihood the Knukle mark is a valid and protectable trademark. "When more than one user claims the exclusive right to use an unregistered trademark, priority is determined by the first actual use of the mark in a genuine commercial transaction." Emergency One, inc. v. Am. Fire Eagle Engine Co., Inc., 332 F.3d 264, 267 (4th Cir. 2003).  Plaintiffs must consequently prove priority of use in order to establish their ownership of the Knukle mark. Plaintiffs have submitted evidence that they made their first internet sale, using the Knukle mark, on August 7, 2008. However, there is some dispute as to when defendants first used the mark in commerce. The Legges claim, in their trademark application, a first use date of June 1, 2008; however, Defendants did not become involved in Knukle Inc. until September 9, 2008. Based on the evidence presented by plaintiffs, it appears the Legges are mistaken about the first use date claimed in their application. Therefore, the Court finds Knukle Inc. is a valid and protected mark.

1  Once a protected mark is recognized, plaintiffs must show defendants' use of the mark is likely to cause confusion. The Ninth Circuit has identified eight factors relevant to determining whether confusion is likely: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. See AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir.1979). The likelihood of confusion may rest on all eight factors or, alternatively, on only those factors that are most pertinent. See Surfvivor Media, Inc. v. Survivor Productions, 406 F.3d 625, 631 (9th Cir.2005).

Strength of the mark "is its ability to indicate the source of the goods or services with which it is used." 2 Gilson on Trademarks § 5.10[1]. The strength of a mark is assessed on a spectrum comprising five categories. "The two strongest sets of marks are 'arbitrary' or 'fanciful' marks, which trigger the highest degree of trademark protection." Surfvivor, 406 F.3d at 631-632. "Arbitrary marks are common words having no connection with the actual product." Rearden LLC v. Rearden Commerce, Inc., 2009 WL 276099 at *8 (N.D. Cal. January 27, 2009). Fanciful marks, for example "Kodak" or "Aveda," are coined phrases also having no commonly known connection with the product at hand. Surfvivor, 406 F.3d at 632. Suggestive marks "do not describe the product's features but suggest them. . . . The exercise of some imagination is required to associate a suggestive mark with the product." Id.; see, e.g., Rearden LLC, 2009 WL 276099 at *9 (finding "Rearden" suggestive of plaintiffs' entrepreneurial business because it invoked an image of entrepreneurial success to people familiar with the character named Rearden in Ayn Rand's Atlas Shrugged). The fourth and fifth categories of trademark are "descriptive" and "generic" marks. Id.

Plaintiffs' Knukle mark is arbitrary or fanciful with respect to the merchandise provided under that mark. The misspelled word Knukle does not appear in the English language, especially when the second "k" is faced in the wrong direction. This mark is similar to the term "Kodak" or "Aveda," which the Ninth Circuit has found to be fanciful marks. Accordingly, the Court finds this mark is fanciful, which weighs in favor of finding defendant's use is likely to cause confusion.

1    Proximity of the goods refers to increased likelihood that consumers will be confused when
2  "the users of similar marks or names sell related good." <u>Accuride Intern, Inc. v. Accuride Corp.</u>, 871
3  F.2d 1531 (9th Cir. 1989). "In other words, the closer the parties are in competitive proximity, the
4  higher the likelihood of confusion." <u>Rearden LLC</u>, 2009 WL 276099 at *9. In the instant case, the
5  proximity of goods weighs in favor of finding defendants' use is likely to cause confusion because the
6  parties are direct competitors. They operate in the same market, supply the same type of goods, and
7  use virtually the same name.

8    Similarity of marks is "tested on three levels: sight, sound, and meaning . . . similarities weigh
9  more heavily than differences." <u>Sleekcraft</u>, 599 F.2d at 351. The Court evaluates "how they [the
10 marks] are presented in the marketplace." <u>Sports Authority Inc. v. Prime Hospitality Corp.</u>, 89 F.3d
11 955, 962 (2d Cir. 1996). In the exhibits attached to the Grooms Declaration, plaintiffs catalogue how
12 defendants are selling exact replicas of plaintiffs' products and mark; the only difference is the
13 orientation of the second "k" in Knukle. <u>See</u> (Grooms Decl., Ex. 26-1 though 26-44.) In each of these
14 situations, the mark is presented on the same color merchandise, written in the same font, written in
15 the same color, and accompanied by the same designs and symbols. For example, Exhibit 26-3 shows
16 plaintiffs' version of a black Chino short, which bears the Knukle mark on the front right leg and brass
17 knuckles embroidered above the left rear pocket. <u>Id.</u>, Ex. 26-3. Defendants' version bears the Knukle
18 Two mark (with a forward facing "k") on the front right leg and brass knuckles embroidered above
19 the left rear pocket. <u>Id.</u> The mark appears in the same location, in the same font, and the same
20 coloring. <u>Id.</u> Plaintiffs provide numerous additional examples in which defendants offer a product
21 that is an exact replica of plaintiffs' product, except defendants orient the second "k" in the traditional
22 manner. This weighs in favor of finding a likelihood of confusion in the marketplace.

23    Evidence that use of a mark or name has already caused actual confusion as to the source of
24 a product or service is "persuasive proof that future confusion is likely." <u>Sleekcraft</u>, 599 F.2d at 352.
25 "To constitute trademark infringement, use of a mark must be likely to confuse an appreciable number
26 of people as to the source of a product." <u>See</u> <u>Entrepreneur Media, Inc. v. Smith</u>, 279 F.3d 1135, 1151.
27 Already, consumers have contacted plaintiffs believing they were contacting defendants. A retailer
28 "Skin" posted a MySpace entry stating he enjoyed meeting Knukle representatives when, in fact, he

1  had met defendants' representatives. A retailer "Fatal Impact" has repeatedly sent inquiries to
2  plaintiffs about the status of an order he placed with defendants. This weighs in favor of finding
3  confusion in the marketplace.
4       Overlapping marketing channels "increase the likelihood of confusion." See Sleekcraft, 599
5  F.2d at 353. Plaintiffs and defendants compete directly for customers via the Internet. Specifically,
6  both parties have, at different times, used the *exact same website* to market their products over the past
7  year. They attend the same tradeshows and sporting events. The marketing channels completely
8  overlap, therefore, this factor weighs in favor of finding a potential for consumer confusion.
9       The degree of consumer care is determined from the standpoint of a "reasonably prudent
10 consumer." Brookfield Communications, Inc. v. West Coast Entertainment Corp., 174 F.3d 1036,
11 1060 (9th Cir. 1999). Expectations for the reasonably prudent consumer are largely based on his or
12 her level of sophistication and the nature of the goods and services involved. For example, "[w]hen
13 the goods are expensive, the buyer can be expected to exercise greater care in his purchases" and
14 "[w]hen the buyer has expertise in the field, a higher standard is proper." Sleekcraft, 599 F.2d at 353.
15 Both parties offer clothing, which is a relatively inexpensive product. The purchasers of t-shirts are
16 unlikely to exercise great care in their purchases. Although plaintiffs make no representations as to
17 the degree of care, this factor weighs in favor of finding a potential for consumer confusion.
18      The defendants' intent is a critical element: If an alleged infringer "adopts his designation with
19 the intent of deriving benefit from the reputation of the trademark or trade name, its intent may be
20 sufficient to justify the inference that there are confusing similarities." Pacific Telesis v. Int'l Telesis
21 Comm., 994 F.2d 1364, 1369 (9th Cir.1993) (quoting Restatement of Torts § 729, Comment f (1938)).
22 Where the alleged infringer knowingly adopts a mark or name similar to another, the court may choose
23 to presume an intent to deceive the consuming public. See Sleekcraft at 354. Defendants clearly chose
24 to use the mark Knukle, with a forward facing "k", to derive a benefit from the reputation of plaintiffs'
25 trademark or trade name. Further evidence is defendants' pre-dissolution attempt to obtain the rights
26 to the Knukle, backwards facing "k." When they were unsuccessful, they formed their own
27 corporation and applied for protection of the Knukle Two mark. Further, they coopted business
28 opportunities, plaintiffs' website, and plaintiffs' suppliers. Defendants appear to have acted in bad

1  faith, justifying an inference that there are confusing similarities.

2  The expansion of products is not a relevant factor to the instant inquiry because the products
3  already directly overlap.

4  iii.    Summary

5  On this record, the Court finds plaintiffs have a valid and protected mark. Further, the Court
6  finds: (1) plaintiffs' mark is strong; (2) the goods are proximate because plaintiffs and defendants are
7  competitors in the same market; (3) defendants' mark bears a strong resemble to plaintiffs' mark; (4)
8  plaintiffs' evidence indicates confusion with respect to the relevant consuming public; (5) the parties'
9  marketing channels substantially overlap; (6) prospective purchasers are likely to exercise a low
10 degree of care; (7) plaintiffs' evidence indicate defendants acted in bad faith; and (8) the expansion
11 of products is irrelevant. All of these factors support plaintiffs' claim; therefore, they have not only
12 shown a likelihood on the merits, but have also demonstrated that the facts and law clearly favor the
13 moving party. Plaintiffs' Lanham Act claim supports both the prohibitory and mandatory injunctions.

14 *2.    Unfair Competition under Cal. Bus & Prof. Code § 17200*

15 i.    Plaintiffs' Arguments

16 Plaintiffs argue defendants have violated Cal. Bus. & Prof. Code § 17200 by using a mark,
17 whose similarity to the Knukle mark is likely to confuse the public.

18 ii.    Analysis

19 California law prohibits unfair competition, defined as "any unlawful, unfair or fraudulent
20 business act or practice." Cal. Bus. & Prof. Code § 17200. Because section 17200 is written in the
21 disjunctive, it prohibits three separate types of unfair competition: (1) unlawful acts or practices, (2)
22 unfair acts or practices, and (3) fraudulent acts or practices. Cel-Tech Communications, Inc. v. Los
23 Angeles Cellular Telephone Co., 20 Cal.4th 163, 180 (1999).

24 An action for unfair competition section 17200 is "substantially congruent" to a trademark
25 infringement claim under the Lanham Act. Int'l Order of Job's Daughters v. Lindeburg and Co., 633
26 F.2d 912, 916 (9th Cir.1980). Under both, the test is "whether the public is likely to be deceived or
27 confused by the similarity of the marks. " Century 21 Real Estate Corp. v. Sandlin, 846 F.2d 1175,
28 1178 (9th Cir.1988) (citations omitted).

1    In the instant case, the likelihood of deception or confusion has been detailed above.
2  Therefore, the Court finds plaintiffs are likely to succeed on the merits of the section 17200 claim.
3  ***3.    Tortious Interference with Prospective Economic Advantage***
4  i.    Plaintiffs' Arguments
5    Plaintiffs argue they are likely to succeed on their claim for tortious interference with
6  prospective economic advantage because defendants intentionally used a mark similar to the Knukle
7  Inc. mark to deliberately interfere with plaintiffs' prospective customers. Defendants allegedly knew
8  plaintiffs had created and were promoting the Knukle mark with customers. With this knowledge,
9  plaintiffs claim defendants intentionally acted to deceive customers as to the origin of goods.
10  ii.    Analysis
11    To maintain a claim for tortious interference with prospective economic advantage, a plaintiff
12  must show:

> (1) an economic relationship between plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) defendant's knowledge of the relationship; (3) intentional acts by the defendant to disrupt the relationship; (4) actual disruption of the relationship; (5) economic harm to the plaintiff proximately caused by the acts of the defendants; (6) conduct that was wrongful by some legal measure other than the fact of interference itself.

17  5 Witkin, Summary of California Law § 742. In the instant case, plaintiffs have shown they had an
18  economic relationship with customers and potential customers. Further, defendants knew of plaintiffs'
19  customer-relationships. Defendants intentionally disrupted these relationships by coopting the Knukle
20  website, creating and using the Knukle Two mark, and taking plaintiffs' place at the ASR tradeshow.
21  These actions caused an actual disruption in the relationships, proximately causing economic harm
22  to plaintiffs. Finally, the conduct is wrongful under the Lanham Act. Plaintiffs are likely to succeed
23  on the tortious interference with prospective economic advantage claim.
24  ***4.    Conversion***
25    To succeed on a claim for conversion, plaintiffs must show (1) a right to own or possess certain
26  property; (2) defendants wrongfully dispossessed plaintiffs of their right; and (3) damages. G.S.
27  Rasmussen & Assocs., Inc. v. Kalitta Flying Service, Inc., 958 F.2d 896, 906 (9th Cir. 1992).
28    Plaintiffs have established a right to the website, the appropriated merchandise, and the Knukle

mark. Further, as set forth above, defendants wrongfully dispossessed plaintiffs of their right by covertly taking ownership of the website; taking merchandise intended for the ASR tradeshow; and improperly using the infringing Knukle Two mark. Finally, plaintiffs have show they suffered damages. Plaintiffs are likely to succeed on the merits of the conversion claim.

**5.    *Cybersquatting***

i.    Plaintiffs' Arguments

Plaintiffs argue defendants have bad intent and have committed cyberpiracy by registering, trafficking, and using the Knukle website. Plaintiffs argue the bad intent is evidenced by the conversion of the domain name www.knukleinc.com and use of the Knukle Two mark.

ii.    Analysis

The Anticybersquatting Consumer Protection Act ("ACPA") is an amendment to the Laham Act that targets cybersquatting.[4] An ACPA violation occurs when a domain name registrant (1) registers, uses, or traffics in a domain name that (2) is identical or confusingly similar to a distinctive or famous trademark, with (3) bad faith intent to profit from the trademark. See 15 U.S.C. § 1125(d).

In the instant case, plaintiffs have shown a likelihood that defendants have committed cybersquatting in violation of the ACPA. The Legges (1) registered a domain name that (2) is identical to the distinctive Knukle trademark, with (3) the bad faith intent to profit from the trademark. As discussed above, the Legges' bad faith is evidenced by their covert control of the website, the use of the infringing Knukle Two mark, and the exclusion of plaintiffs from their own company's website. Defendants have a bad faith intent to profit from the trademark by using the site.

**B.    Irreparable Harm**

i.    Plaintiffs' Arguments

Plaintiffs argue they are entitled to a presumption of irreparable injury because they have shown the likelihood of success on the merits in a trademark case, citing Columbia Pictures Indus., Inc. v. Miramax Films Corp., 11 F. Supp. 2d 1179, 1184 (C.D. Cal. 1998). Further, even if the court

---

[4] "Cybersquatting" occurs when an "individual other than the trademark owner registers a domain name similar or identical to the trademark and 'then attempts to profit from this by either ransoming the domain name back to the trademark holder or by using the domain name to divert business from the trademark holder to the domain name holder.'" Verizon California Inc. v. Online NIC Inc., 2008 WL 5352022 (N.D. Cal. December 19, 2008).

1  does not apply the presumption, plaintiffs argue they would suffer damage to their business reputation,
2  trademarks, trade name, and goodwill. Further, plaintiffs argue defendants have recently sought
3  further investment, demonstrating that they are headed to insolvency – which would damage the image
4  the Knukle mark.

ii. Analysis

A preliminary injunction "may only be granted when the moving party has demonstrated a significant threat of irreparable injury." Simula, Inc v. Autoliv, Inc., 175 F.3d 716, 725 (9th Cir. 1999). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm. " Sampson v. Murray, 415 U.S. 61, 90 (1974). Establishing a risk of future harm is insufficient, the harm must be imminent. Caribbean Marine Serv. Co., Inc. v. Baldridge, 844 F.2d 688, 674 (9th Cir. 1988). Even if plaintiffs establish success on the merits, "the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." Siegel v. Le Pore, 234 F.3d 1163, 1176 (11th Cir. 2000).

The normal calculus is altered somewhat in a trademark infringement case, in that "[i]rreparable injury is ordinarily presumed upon a showing of a likelihood of success." Abercrombie & Fitch Co. v. Moose Creek, Inc., 486 F.3d 629, 633 (9th Cir.2007); Vision Sports, Inc. v. Melville Corp., 888 F.2d 609, 612 n. 3 (9th Cir.1989) ("In trademark infringement or unfair competition actions, once the plaintiff establishes a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief is not granted."). Therefore, the Court presumes irreparable harm.

Even without this presumption, the instant plaintiffs have demonstrated the threat of irreparable harm. In Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc., 240 F.3d 832, 841 (9th Cir. 2001), the Ninth Circuit found threatened loss of prospective customers and goodwill constitutes irreparable harm in the trademark context. In the instant case, plaintiffs have shown defendants have already taken prospective customers. Further, defendants' repeated attempts to register a mark substantially similar to the Knukle mark threatens the value of the Knukle mark. The Court finds plaintiffs have met the irreparable harm requirement.

**C. Balance of the Hardships**

i. Plaintiffs' Arguments

Plaintiffs argue a failure to issue the injunction will destroy their business. Plaintiffs argue defendants' use of an infringing mark is not an injury, citing Hotmail Corp. v. Van$ Money Pie Inc., 1998 WL 388389 at *8 (N.D. Cal. April 16, 1998); Cadence Design Systems, Inc. v. Avant! Corp., 125 F.3d 824 (9th Cir. 1997). Therefore, plaintiffs argue the balance tips sharply in their favor.

ii. Analysis

Before an injunction may issue, the court must weigh the hardship injunctive relief may cause defendants against the threatened harm to plaintiffs. "[T]he real issue in this regard is the degree of harm that will be suffered by the plaintiff or the defendant if the injunction is *improperly* granted or denied." Scotts Co. v. United Industries Corp., 315 F.3d 264, 284 (4th Cir. 2002).

In the instant case, the Court finds the potential irreparable harm to plaintiffs outweighs any injury to defendants. If the injunctions are not issued, plaintiffs will continue to suffer injury to their business and loss of good will in the community. If the injunction is issued, defendants will be forced to cease selling inventory bearing either the Knukle mark or the Knukle Two mark. However, defendants do not have a right to reap profits from marketing work that infringes plaintiffs' trademark. Accord, Hotmail Corp., 1998 WL 388389 at *8; see also Cadence Design Sys., 125 F.3d at 830 (noting the balance of hardships does not weigh against entry of a preliminary injunction where the only alleged hardship to defendant was the loss of profits from marketing work that infringed a copyright). Therefore, the Court finds the balance of hardships weighs in favor of granting the temporary restraining order.

**D. Other Issues**

*1. Mandatory Injunctions*

Plaintiffs have show that "the facts and law clearly favor the moving party." Dahl v. HEM Pharmaceuticals Corp., 7 F.3d 1399, 1403 (9th Cir. 1993). Based on plaintiffs' papers, it is clear the facts and law support plaintiffs' claims. Defendants appear to have committed infringement by using the Knukle Two mark; therefore, the Court grants the mandatory injunctions.

//

1  *2.*     *Request for Expedited Discovery*

2         Plaintiffs request expedited written discovery in the form of Form Interrogatories; Requests
3  for Identification and Production of Documents; and up to three depositions prior to the preliminary
4  injunction hearing. The Ninth Circuit uses the "good cause" standard to determine whether discovery
5  should be allowed to proceed prior to a Rule 26(f) conference. Good cause may be found where the
6  need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice
7  to the responding party. Semitool, Inc. v. Tokyo Electron Am., Inc., 208 F.R.D. 273, 276
8  (N.D.Cal.2002). "It should be noted that courts have recognized that good cause is frequently found
9  in cases involving claims of infringement and unfair competition." Semitool, 108 F.R.D. at 276. At
10 oral argument, plaintiffs expressed concern that funds would be diverted and customer lists lost
11 without discovery. Good cause appearing, the Court GRANTS plaintiffs' request for expedited
12 discovery and REFERS the matter to the magistrate judge.

13                              **CONCLUSION**

14        For the foregoing reasons, the Court GRANTS plaintiffs' application for a temporary
15 restraining order. A hearing on the preliminary injunction is set for April 7, 2009 at 10:30 a.m.

17 IT IS SO ORDERED.
18 DATED: March 17, 2009

19                          _____
                            IRMA E. GONZALEZ, Chief Judge
20                          United States District Court