1

2

3

4

5

6        **UNITED STATES DISTRICT COURT**

7       **SOUTHERN DISTRICT OF CALIFORNIA**

8

| | |
|---|---|
| 9  JAMES GROOMS; BRYCEMARIE PHELAN; KNUKLE, INC., a Colorado corporation, | CASE NO. 09cv489 - IEG - POR |
| 10 | ORDER |
| 11                          Plaintiffs, | (1) GRANTING IN PART THE PRELIMINARY INJUNCTION; |
| 12            vs. | |
| 13 | (2) DENYING PLAINTIFFS' MOTIONS FOR CONTEMPT, SANCTIONS, AND ATTORNEYS' FEES |
| 14 | |
| 15  JOHN LEGGE; GWEN LEGGE; KNUKLE, INC., a California corporation; ARTILLERY DISTRIBUTION; SEAN MYERS; DEVIN MERCADO; DOES 1-50, | (3) DENYING DEFENDANTS' MOTIONS TO STRIKE |
| 16 | [Doc. Nos. 4, 18] |
| 17                          Defendants. | |

18        Presently before the Court are (1) plaintiffs' motion for preliminary injunction and (2)

19   plaintiffs' ex parte application for contempt, sanctions, and attorneys' fees.  The parties have fully

20   briefed these motions.  Further, defendants filed two motions to strike evidence submitted in support

21   of plaintiffs' motion and plaintiffs' reply. (Doc. Nos. 27-8, 43.) Based upon the parties' submissions,

22   and for the reasons set forth below, the Court (1) GRANTS IN PART plaintiffs' motion for

23   preliminary injunction; (2) DENIES plaintiffs' motion for contempt, sanctions, and attorneys' fees;

24   and (3) DENIES defendants' motions to strike.

25                                    **BACKGROUND**

26   **A.    The Parties**

27        Plaintiffs James Grooms and Brycemarie Phelan are individuals residing in Colorado.  Plaintiff

28   Knukle, Inc. ("Knukle One") is a Colorado corporation with its principal place of business in Colorado

1   Springs, Colorado.   Knuckle One was incorporated on November 28, 2009, but began as an

2   unincorporated business entity in May 2008.

3          Defendants John Legge and Gwen Legge (collectively the "Legges") are a married couple

4   living in Orange County, California.  The Legges are part owners of defendant Knukle, Inc. ("Knukle

5   Two"), a California corporation formed on September 19, 2008 with a principal place of business in

6   Orange County, California.

7          Defendants Sean Myers and Devin Mercado own and operate Artillery Distribution, which is

8   a graphic design company.  Myers, Mercado, and Artillery Distribution have not been served in, or

9   appeared in, this action.

10  **B.      Factual Background**

11  i.      Formation

12         In May 2008, Grooms and Phelan created the name "Knukle Inc" ("Knukle" was deliberately

13  misspelled by omitting the "c" and turning the second "k" backwards).  They created the name and

14  some initial drawings, which combined the name Knukle Inc and a symbol representing brass

15  knuckles.  The name and these drawings became the genesis of a line of apparel and accessories

16  targeted at fans of extreme sports and mixed martial arts.  Grooms and Phelan reserved the domain

17  name www.knuckleinc.com ("Knukle website") using an internet provider www.1and1.com.

18         On June 12, 2008, Grooms and Phelan filed a federal "intent to use" trademark application for

19  the mark "Knukle" (with the second "k" turned backwards), serial number 77497169.

20         On July 8, 2008, after contacting various other vendors, Grooms and Phelan approached

21  Artillery Distribution, asked for its assistance refining the Knukle designs, and requested estimates

22  for printing designs on apparel and accessories.  Over the phone, Grooms informed defendants Myers

23  and Mercado of his trademark application and his intent to form the company "Knukle Inc."

24         During July 2008, Grooms and Phelan acted to establish Knukle Inc.  They ordered business

25  cards, established a merchant services account with Wells Fargo, and created Facebook and MySpace

26  pages.[1]  Additionally Grooms, Phelan, Myers, and Mercado attended the X-games in Long Beach and

27

28         [1] "Facebook" and "MySpace" are social networking sites which allow users to create profiles
    with information about the user or her business.

distributed promotional "Knukle, Inc" apparel to event attendees.[2]  On or about August 3, 2009, Grooms and Phelan made their first sale of Knukle, Inc apparel to Alicia Rogers: two t-shirts for $40.00  On August 7, 2008, Grooms and Phelan made their first internet sale of Knukle Inc apparel.

ii.      The Business Relationship

During late August or early September of 2008, Grooms and Phelan placed an advertisement on www.craigslist.com, seeking investors for Knukle.[3]  On September 9, 2008, Gwen Legge contacted Grooms and Phelan and expressed interest in investing in Knukle Inc.  Grooms, Phelan, and the Legges agreed to meet on September 13, 2008.

On September 13, 2008, plaintiffs met with defendants at a restaurant in Dana Point, California.  Grooms and Phelan brought sample Knukle Inc apparel to the meeting.  The Legges orally agreed to invest $115,000, up-front, in exchange for 50% ownership of "Knukle Inc."  The parties orally agreed to be "50-50 partners."  (Def. Opp. at 4.)

The terms of this oral agreement are disputed.  Plaintiffs assert the parties agreed to be 50-50 partners, with no mention of the formation of a corporation or the transfer of the trademark.  The Legges claim the parties orally agreed to form a California corporation, with the Legges providing financing and plaintiffs transferring the trademark application to Knukle Two. On September 16, 2008, Grooms drafted an email memorializing the oral agreement between the Legges, Grooms, and Phelan.  The email stated the parties agreed to set up a corporation, but did not mention the transfer of the trademark.  (Grooms Decl., Ex. 10.)

After this meeting, John Legge established independent contact with Myers of Artillery Distribution.  Together, John Legge and Myers informed Grooms they needed to change the Knukle website's webhost from Dreyson Solana to Bluehost in order to improve the site.  Grooms agreed to the changes, but asserts he did not know the domain name was transferred to John Legge.

Based on the September oral agreement, on September 19, 2008, the Legges formed Knukle Two.  At that point, the Legges began investing to build the Knukle brand, which included paying for

---

[2] The "X-games" is an annual event with a focus on extreme sport action, such as skateboarding and BMX biking.

[3] "Craigslist.com" is a free website which is equivalent to an online classified advertisement section of a newspaper.

designs, silkscreening, artwork, promotions, sponsorships, and a booth at a major trade show.  The parties dispute the exact amount of the investment.  Additionally, the Legges claim they provided office space free of charge in Santa Ana.

After the formation of Knukle Two, plaintiffs did not receive shares of Knukle Two and never transferred ownership of the Knukle mark.  Defendants admit "Mr. Grooms and Ms. Phelan never transferred the mark but kept giving me assurances they would."  (Decl. John Legge ¶ 15.)  John Legge states, "I informed Mr. Grooms and Ms. Phelan that their 50% of the corporation will be issued to them upon them assigning the right to the mark to the corporation as per our agreement."  (Decl. John Legge ¶ 16.)  Legge admits he "did not issue Mr. Grooms and Ms. Phelan their 50% ownership [in Knukle Two]."  From this, it is evident Grooms and Phelan never owned shares in Knukle Two and did not transfer their trademark to Knukle Two.

iii.      The Fracture of the Relationship

During preparation for the Action Sports Retailers trade show ("ASR trade show") scheduled for January 2009, John Legge began meeting with Myers and Mercado without consulting plaintiffs.

On November 5, 2008, Gwen Legge told Grooms that the Legges had opened a merchant account.  Grooms understood the Legges would need an Employer Identification Number (EIN) to open that account.  When he inquired about the EIN, Gwen claimed the Legges were only *thinking* about opening a merchant account.  At this point, Grooms and Phelan became nervous about the actions the Legges had taken.  Gwen Legge asserts she never opened a merchant account on behalf of Knukle.  On November 28, 2008, Grooms formed Knukle One, a Colorado corporation.

On December 16, 2008, Gwen Legge called Grooms to request that he and Phelan assign to her their individual interests in the Knukle marks.  Further, she requested Grooms and Phelan agree to move the company headquarters to Orange County, California.   Grooms declined both requests.  Gwen Legge claims she never requested plaintiffs transfer the Knukle mark to her as an individual.

Later that evening, Myers and Mercado called Grooms and informed him that the Legges were covertly starting their own company around a line of apparel targeting fans of extreme sports and mixed martial arts.  The Legges planned to market the apparel at the ASR trade show with the brand name "Knukle Inc" (with the second "k" turned forwards) (the "Knukle Two mark").  Both Myers and

1    Mercado assert they never told Grooms that the Legges were "going behind [plaintiffs'] back." (Decl.

2    Myers, ¶ 27; Decl. Mercado, ¶27.)

3         Still later on December 16, 2008, Grooms called John Legge to express his concern about the

4    phone call he received from Artillery Distribution.  Grooms explained that if the Legges left the

5    company, they could not use the name "Knukle."  John Legge replied with vulgarity and expletives.

6    Grooms offered to assign his and Phelan's rights to the trademarks if he and Phelan retained 51% of

7    the company.  The Legges did not agree to those terms.  Later that night, during a subsequent phone

8    call, John Legge offered to allow Grooms and Phelan to buy him out for 120% of the initial

9    investment.  The following day, Grooms and Phelan offered to buyout the Legges for a percentage less

10   than 120%, but John Legge said buyout was no longer an option.

11        On December 18, 2008, Knukle Two filed a federal "actual use" trademark application for the

12   mark, "Knukle Inc" with the second "k" turned forwards, Serial Number 77636449.  The Legges

13   contend this occurred because they were concerned plaintiffs would never transfer the original Knukle

14   mark.  Knukle Two subsequently amended the filing basis to "intent to use" on March 4, 2009.  On

15   January 5, 2009, Knukle Two filed a second federal "actual use" trademark application under a

16   different International Class.  In these two applications, the Legges claim a first date of use as June

17   1, 2008 – a claim plaintiffs assert is impossible.

18        On January 22-24, 2009, the Legges sent Myers and Mercado to the ASR trade show to

19   procure orders for the sale of "Knukle Inc." designs and merchandise.  Artillery Distribution and

20   Abstrakt Printing provided the merchandise.  Plaintiffs did not attend the ASR show because Artillery

21   Distribution released all of the "Knukle, Inc." merchandise to the Legges.  Further, a trade show

22   representative informed Grooms that only the Legges were allowed to attend the show.

23        On January 30, 2009, Grooms noticed a new website had been posted at www.knukleinc.com.

24   Grooms could not log onto the website as the site owner.  At that time, Grooms noticed the Knukle

25   Inc Facebook and MySpace pages began receiving postings calling Grooms and Phelan imposters.

26   These postings contained information that could only be known by someone with intimate knowledge

27   of the business relationship between the parties.

28

On February 5, 2009, Grooms received an email from a representative retailer based in Bakersfield named "Fatal Impact." Fatal Impact stated he was excited to receive his shipment of new "Knukle, Inc." apparel. Grooms and Phelan never received an order from Fatal Impact. Fatal Impact requested a status update via MySpace on March 8, 2009. Further, a retailer named "Skin" posted a MySpace message stating he enjoyed meeting Knukle representatives. Skin had only meet defendants' representatives.

On February 10, 2009, Grooms contacted Don Petro of Big League Graphics to fill an order. Petro contacted Independent Trading Company, a blank sweatshirt wholesaler. Independent Trading Co. informed Petro that an order from "Knukle, Inc" had already been made for a design "Knukle Up." The order was for more than $200,000 of sweatshirts imported from China.

Since the dissolution of the business relationship, Knukle Two has promoted its product using the Knukle Two mark and the Knukle website. In the exhibits attached to the Grooms Declaration, plaintiffs catalogue how defendants are selling exact replicas of plaintiffs' products and mark; the only difference is the orientation of the second "k" in Knukle. See (Grooms Decl., Ex. 26-1 though 26-44.) In each of these situations, the mark is presented on the same color merchandise, written in the same font, written in the same color, and accompanied by the same designs and symbols.

The Legges assert that, despite Grooms's inability to access the site and nonattendance at the ASR tradeshow, the Legges never attempted to exclude plaintiffs from Knukle Two. Instead, the Legges assert, plaintiffs effectively abandoned the business, moved to Colorado, and started a competing venture.

**C.      Procedural Background & Subsequent Conduct of Counsel and Parties**

Plaintiffs filed a complaint alleging fifteen claims for relief: (1) unfair competition and false designation of origin of goods under 15 U.S.C. §1125; (2) cybersquatting, in violation of 15 U.S.C. § 1125(d); (3) violations of California Business & Professions Code §§ 17200, 17500; (4) unfair competition under California's common law; (5) trademark and trade name infringement; (6) conversion; (7) fraud; (8) intentional interference with prospective business advantage; (9) intentional interference with economic relationships; (10) defamation; (11) breach of oral/implied contract; (12) civil conspiracy; (13) declaratory relief; (14) accounting; and (15) constructive trust/ equitable lien.

In their TRO/preliminary injunction application, plaintiffs request a series of prohibitory injunctions and mandatory injunctions.  Plaintiffs request the court prohibit defendants from: (1) holding themselves out as rightful owners of "Knukle, Inc." enterprise; (2) asserting ownership rights and control over plaintiffs' property and intellectual property rights including the trademarks "Knukle Inc," "Knukle, Inc.,"and "Knukle"(collectively "Knukle mark") and the domain name/website www. knukleinc.com ("Knuckle website"); (3) using the Knukle marks in commerce; (4) using "Knukle Inc," "Knukle, Inc.,"and "Knukle" trade names in commerce; (5) using the domain name and Knukle website; (6) using photographs, graphics, and designs bearing the Knukle marks in advertising; (7) marketing, selling, distributing any clothing, merchandise, or accessories bearing the Knukle marks; and (8) operating Knukle Two to compete with Knukle One.

Plaintiffs further request four mandatory injunctions, directing defendants to: (1) place all funds and accounts receivable from the sale of clothing, merchandise, and accessories bearing the Knukle marks in a Court controlled account; (2) transfer ownership and control of the domain name/website www.knukleinc.com to plaintiffs; (3) return the designs, silk screening, artwork, films, and other materials necessary to produce apparel and promotional materials to plaintiffs; and (4) provide names and contact information of third parties who have currently placed orders with Knukle Two.

On March 17, 2009, this Court issued an order granting the TRO and setting the preliminary injunction hearing for April 7, 2009 at 10:30 a.m.  Defendants did not appear at the TRO hearing,  but claim that plaintiffs' counsel misinformed them as to the date of the hearing.[4]  On March 18, 2009, plaintiffs filed an undertaking of $10,000; thereby, triggering the TRO.

On March 20, 2009, plaintiffs learned defendants had not turned over ownership and control of the website and domain name, www.knukleinc.com.  Plaintiffs' counsel then spent four days unsuccessfully attempting to contact defendants' counsel, Mr. Jain.  Defendants assert Mr. Jain's unavailability was due to his uncle's illness, which forced him to travel out-of-town.  On March 24, 2009, plaintiffs' counsel received a message from Mr. Jain, who asserted his clients had fully

_____

[4] Mr. Jain claims plaintiffs' counsel handwrote the date on the order to show cause, which misinformed him of the date of the TRO hearing.  However, four days before the hearing, Mr. Jain received a copy of the Court's order, which explicitly set forth the date of the hearing. [Doc. No. 5.]

complied with the TRO and asked plaintiffs' counsel to clarify which portions of the order his clients had violated.   Later that day, the Legges retained Michelle McCliman.

Later on March 24, 2009, Ms. McCliman contacted plaintiffs' counsel Chris Villasenor to explore stipulating to a preliminary judgment.   The deal offered was a stipulated injunction that the Legges would cease using the Knukle name and website.  The website would be blank and simply direct those looking for Plaintiffs' Knukle site to that site and those looking for defendants' new venture to that site (defendants fail to identify their "new venture").  The offer included a provision that Plaintiffs would agree to not sue the Legges new venture and would refrain from using the website design paid for by the Legges.  The only point of contention was that plaintiffs wanted the transfer of the domain name.  The parties disagreed as to the meaning of the portion of the TRO regarding the transfer of the domain name.  Mr. Villasenor declined to seek clarification from the Court.

On March 25, 2009, Ms. McCliman confirmed that the website had been taken down and that the MySpace page was also taken down.  Mr. Villasenor indicated he intended to file the ex parte application for contempt unless the Legges paid his clients $10,281 prior to the hearing.

On that date, plaintiffs' counsel filed the Ex Parte Motion for contempt, sanctions, and attorneys' fees. (Doc. No. 19.) Plaintiffs based this motion primarily on defendants failure to transfer ownership of the website.  On March 27, 2009, this Court issued an order to show cause why defendants should not be held in contempt, subjected to sanctions, and ordered to pay attorneys' fees.

Also on March 27, 2009, Judge Battaglia held a Discovery conference with counsel for plaintiffs and counsel for the Legges present.  At the Discovery conference, counsel discussed the language of the TRO, and Magistrate Judge Battaglia agreed the language was confusing.  Per a minute order, entered on March 30, 2009, Judge Battaglia directed defendants to file an ex parte application for clarification of the TRO's provisions regarding the transfer of the website.

On March 28, 2009, Ms. McCliman e-mailed plaintiffs' counsel asking if he would withdraw the current Ex Parte application for contempt, sanctions, and attorneys' fees in light of the events that occurred at the Discovery Conference.  Mr. Villasenor declined to withdraw the application.

On March 30, 2009, plaintiffs requested clarification of the TRO.  In an order dated April 1,

2009, the Court determined defendants had complied with the contested portion of the TRO. Specifically, the Court found the TRO ordered transfer of the website only with respect to "prior or current purchase orders." (Doc. No. 46.)  Therefore, the Court reasoned:

> Because this does not involve any future orders, the Court finds that defendants have complied with the order by closing the website. At this juncture, turning over control of the website would affect future purchase orders, which exceeds the bounds of the above quoted conditional language. Therefore, the Court orders the parties to hold the status quo . . . until the April 7, 2009 hearing . . . .

(Doc. No. 46.)

## LEGAL STANDARD

### I.    Preliminary Injunction

When pursuing an injunction, all courts agree a plaintiff must show "irreparable injury" and that legal remedies are "inadequate." Arcamuzi v. Continental Air Lines, Inc., 819 F.2d 935, 937 (9th Cir. 1987).  However, the Ninth Circuit uses two alternative tests to evaluate the propriety of a temporary restraining order or a preliminary injunction.  Under the "traditional test," courts implement four factors to evaluate the application:

> (1) the likelihood of the moving party's success on the merits; (2) the possibility of irreparable injury to the moving party if relief is not granted; (3) the extent to which the balance of hardships favors the respective parties; and (4) in certain cases, whether the public interest will be advanced by granting the preliminary relief.

Owner-Operator Indep. Drivers Ass'n v. Swift Transp. Co., Inc., 367 F.3d 1108, 1111 (9th Cir. 2004). Alternatively, courts require the moving party to "demonstrate either (a) probable success on the merits combined with the possibility of irreparable injury or (b) that she has raised serious questions going to the merits, and that the balance of hardships tips sharply in her favor." Bernhardt v. County of Los Angeles, 339 F.3d 920, 925 (9th Cir.2003).   These are not two separate tests, but rather two points on a sliding scale in which the required showing of harm varies inversely with the required showing of meritoriousness. Clear Channel Outdoor, Inc. v. City of Los Angeles, 340 F.3d 810, 813 (9th Cir. 2003).  Because a preliminary injunction is an extraordinary remedy, the movant must carry its burden of persuasion by a "clear showing." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997). Mandatory injunctions are "subject to heightened scrutiny and should not be issued unless the facts and law *clearly favor* the moving party." Dahl v. HEM Pharmaceuticals Corp., 7 F.3d 1399, 1403 (9th

1  Cir. 1993) (emphasis added).

2  **II.      Contempt, Sanctions, and Attorneys' Fees**

3          A court has power to adjudge in civil contempt any person who disobeys a "specific and

4  definite court order" by:

5              fail[ing] to take all reasonable steps within the party's power to comply.
               The contempt "need not be willful," and there is no good faith
6              exception to the requirement of obedience to a court order. But a
               person should not be held in contempt if his action " 'appears to be
7              based on a good faith and reasonable interpretation of the [court's
               order].' " "Substantial compliance" with the court order is a defense to
8              civil contempt, and is not vitiated by "a few technical violations" where
               every reasonable effort has been made to comply.
9              The party alleging civil contempt must demonstrate that the alleged
               contemnor violated the court's order by "clear and convincing
10             evidence," not merely a preponderance of the evidence.

11  Go-Video v. Motion Picture Ass'n of Am., 10 F.3d 693, 695 (9th Cir.1993) (internal citations omitted).

12          Should a court find a party in contempt, the court has discretion in deciding whether to impose

13  sanctions. See General Signal Corp. v. Donallco, Inc., 787 F.2d 1376, 1379 (9th Cir.1986). "Sanctions

14  for civil contempt may be imposed to coerce obedience to a court order, or to compensate the party

15  pursuing the contempt action for injuries resulting from the contemptuous behavior, or both." Id.

16                                     **DISCUSSION**

17  **I.       MOTION FOR PRELIMINARY INJUNCTION**

18  **A.       Likelihood of Success on the Merits**

19  ***1.      Lanham Act Origin of Goods Claim***

20  <u>i.</u>        Parties' Arguments

21          Plaintiffs argue they are likely to succeed on the merits of their Lanham Act claim because

22  defendants' use of the Knukle Two mark is likely to cause consumer confusion as to the origin of

23  goods.  Plaintiffs note, to prove a Lanham Act origin of goods claim, a plaintiff must show "[1] a valid

24  and protected mark and [2] that Defendant's use of a similar mark is likely to cause confusion."

25  Creative Tech., Ltd. v. SRT, Inc., 1993 WL 603292 at *1 (N.D. Cal. November 8, 1993).

26          Plaintiffs assert the Knukle mark is valid and protected common law trademark, citing

27  Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery, 150 F.3d 1042, 1047 n. 7 (9thc Cir. 1998);

28  Creative Tech, 1993 WL 603292 at *1.

1    Plaintiffs argue, in detail, that the defendants' use of the Knuckle Two mark is likely to cause

2    confusion because defendants are using an almost identical "Knuckle, Inc." mark for a competing line

3    of apparel and accessories targeted at fans of extreme sports.  Plaintiffs apply, in detail, the Ninth

4    Circuit's eight factors test to determine the likelihood of confusion.  AMF, Inc. v. Sleekcraft Boats,

5    599 F.2d 341, 348-49 (9th Cir. 1979).

6    Defendants make a fairness argument.  They argue that they invested the majority of the

7    money into developing the Knuckle brand; therefore, they should be entitled to use the mark.

8    Defendants do not contest that the Knuckle Two mark is likely to cause confusion.

9    ii.    Analysis

10    A plaintiff may show that it is likely to succeed on the merits of its trademark infringement

11    claim under the Lanham Act by establishing that (1) it owns a "valid, protectable trademark," and (2)

12    defendants' "use of the mark is likely to cause confusion." See Applied Info. Sciences Corp. v. eBay,

13    Inc., 511 F.3d 966, 969 (9th Cir. 2007).  Because defendants do not contest their mark is likely to

14    cause confusion, the Court focuses solely on whether plaintiffs own a valid, protectable trademark.

15    It is undisputed plaintiffs owned a valid, protectable trademark before September 2008.

16    "When more than one user claims the exclusive right to use an unregistered trademark, priority is

17    determined by 'the first actual use of [the] mark in a genuine commercial transaction.'" Emergency

18    One, Inc. v. Am. Fire Eagle Engine Co., 332 F.3d 264, 267 (4th Cir. 2003) (quoting Allard Enters.,

19    Inc. v. Advanced Programming Res., Inc., 146 F.3d 350, 358 (6th Cir. 1998).  Plaintiffs must

20    consequently prove priority of use in order to establish their ownership of the Knuckle mark.

21    Defendants admit plaintiffs had first ownership and plaintiffs have submitted evidence that they made

22    their first internet sale, using the Knuckle mark, on August 7, 2008.

23    Defendants' fairness argument is unavailing because the investment of money to build a brand

24    does not transfer the rights of the trademark.  The mere fact the parties entered into a partnership did

25    not transfer the mark.  "One who is the owner of a trade-mark does not, by entering  a partnership and

26    permitting the use of the trade-mark by the partnership, transfer his interest in the trade-mark to the

27    firm."  E. F. Prichard Co. v. Consumers Brewing Co., 136 F.2d 512, 521 (6th Cir. 1943).  Further,

28    "[w]hen a trade-mark or trade-name is owned by one who enters into a partnership with another for

the manufacture of the article designated, the title of the trade-mark does not pass to the partnership except by express agreement." <u>Greacen v. Bell</u>, 115 F. 553, 554 (D. N.J. 1902). The mere entry into the partnership did not transfer the title of trademark.

Further, defendants have not show that the September 2008 agreement transferred ownership of the Knukle mark.[5] Defendants assert plaintiffs orally agreed to transfer the mark to the corporation the parties planned to form. (Decl. John Legge ¶7; Decl. Gwen Legge ¶ 7; Mercado Decl. ¶ 13; Myers Dec. ¶ 13.) Plaintiffs assert transfer of ownership of the mark was not part of the oral agreement. (Decl. Grooms ¶ 23.) Instead, plaintiffs assert, the agreement gave the Legges a 50% stake in the venture in exchange for their investment. <u>Id.</u>

Both parties proffer minimal evidence supporting their positions regarding the oral partnership agreement. Defendants present the declarations of John Legge, Gwen Legge, Sean Myers, and Devin Mercado, who unsurprisingly all aver that the agreement included a promise to transfer the Knukle mark. Plaintiffs present the declarations of Grooms and Phelan, who naturally assert the partnership agreement did not contemplate transferring the trademark. Further, plaintiffs present an email Grooms sent on September 16, 2008 to Gwen Legge memorializing the oral agreement between the parties. (Grooms Decl, Ex. 10.) The email makes no mention of transferring the title of the trademark to the new corporation. <u>Id.</u> Defendants did not seek to correct Grooms's characterization of the partnership – tacitly affirming the terms. Because the evidence does not weigh in favor of either party, plaintiffs are likely to prevail because defendants will likely be unable to show the September 2008 deal transferred the mark. Accordingly, the Court finds plaintiffs have shown ownership of a valid and protectable mark.

As previously noted, defendants do not contest that the Knukle Two mark is likely to cause confusion. Accordingly, the Court finds plaintiffs are likely to succeed on their Lanham Act claims.

***2.     Unfair Competition under Cal. Bus & Prof. Code § 17200***

i.     <u>Parties' Arguments</u>

---

[5] Defendants bear the burden of showing the September 2008 agreement transferred the mark because, procedurally, they would raise this as an affirmative defense and/or as a counterclaim. If defendants were able to show the plaintiffs intended to transfer the Knukle mark, then the Court could order specific performance.

1    Plaintiffs argue defendants have violated Cal. Bus. & Prof. Code § 17200 by using a mark,

2    whose similarity to the Knukle mark is likely to confuse the public.

3    Defendants argue the Lanham Act claim fails; therefore, the §17200 claim will also fail.

4    ii.    Analysis

5    California law prohibits unfair competition, defined as "any unlawful, unfair or fraudulent

6    business act or practice."  Cal. Bus. & Prof. Code § 17200.  Because section 17200 is written in the

7    disjunctive, it prohibits three separate types of unfair competition: (1) unlawful acts or practices, (2)

8    unfair acts or practices, and (3) fraudulent acts or practices.  Cel-Tech Communications, Inc. v. Los

9    Angeles Cellular Telephone Co., 20 Cal.4th 163, 180 (1999).

10    An action for unfair competition section 17200 is "substantially congruent" to a trademark

11    infringement claim under the Lanham Act.  Int'l Order of Job's Daughters v. Lindeburg and Co., 633

12    F.2d 912, 916 (9th Cir.1980). Under both, the test is "whether the public is likely to be deceived or

13    confused by the similarity of the marks. " Century 21 Real Estate Corp. v. Sandlin, 846 F.2d 1175,

14    1178 (9th Cir.1988) (citations omitted).

15    In the instant case, the likelihood of deception or confusion has been detailed above.

16    Therefore, the Court finds plaintiffs are likely to succeed on the merits of the section 17200 claim.

17    ***3.      Tortious Interference with Prospective Economic Advantage***

18    i.    Parties' Arguments

19    Plaintiffs argue they are likely to succeed on their claim for tortious interference with

20    prospective economic advantage because defendants intentionally used a mark similar to the Knukle

21    Inc. mark to deliberately interfere with plaintiffs' prospective customers.  Defendants allegedly knew

22    plaintiffs had created and were promoting the Knukle mark with customers.  With this knowledge,

23    plaintiffs claim defendants intentionally acted to deceive customers as to the origin of goods.

24    Defendants argue plaintiffs have not specified any economic relationship they have with a third

25    party that had a probability of future economic benefit.  Second, defendants argue plaintiffs do not

26    mention the Legges knew of these unidentified third parties.  Third, defendants assert plaintiffs made

27    no showing the Legges acted to disrupt these prospective relationships. Finally, Defendants assert

28    plaintiffs fail to show wrongful conduct.

ii.      Analysis

To maintain a claim for tortious interference with prospective economic advantage, a plaintiff must show:

> (1) an economic relationship between plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) defendant's knowledge of the relationship; (3) intentional acts by the defendant to disrupt the relationship; (4) actual disruption of the relationship; (5) economic harm to the plaintiff proximately caused by the acts of the defendants; (6) conduct that was wrongful by some legal measure other than the fact of interference itself.

5 Witkin, Summary of California Law § 742.

In the instant case, plaintiffs have shown a likelihood they can prove the elements of this claim. First, plaintiffs had an economic relationship with customers and potential customers. Plaintiffs contacted numerous retailers and other customers prior to the ASR trade show. Further, plaintiffs were deprived of the opportunity to attend the ASR trade show. Finally, plaintiffs have shown customers who visited the website prior to the dissolution of the relationship have ordered merchandise bearing the infringing marks. Second, defendants had intimate knowledge of plaintiffs' customer-relationships. Third, defendants intentionally disrupted these relationships by coopting the Knukle website, creating and using the Knukle Two mark, and taking plaintiffs' place at the ASR tradeshow. Fourth, these actions caused an actual disruption in the relationships, proximately causing economic harm to plaintiffs. Fifth, the Lanham Act prohibits this conduct. Plaintiffs are likely to succeed on the tortious interference with prospective economic advantage claim.

**4.      Conversion**

To succeed on a claim for conversion, plaintiffs must show (1) a right to own or possess certain property; (2) defendants wrongfully dispossessed plaintiffs of their right; and (3) damages. G.S. Rasmussen & Assoc., Inc. v. Kalitta Flying Service, Inc., 958 F.2d 896, 906 (9th Cir. 1992).

Plaintiffs have established a right to the website, the appropriated merchandise, and the Knukle mark. Further, as set forth above, defendants wrongfully dispossessed plaintiffs of their right by covertly taking ownership of the website; taking merchandise intended for the ASR tradeshow; and improperly using the infringing Knukle Two mark. Finally, plaintiffs have shown they suffered damages. Plaintiffs are likely to succeed on the merits of the conversion claim.

1
### 5.     *Cybersquatting*

2
i.     Parties' Arguments

3       Plaintiffs argue defendants, with bad intent, committed cyberpiracy by registering, trafficking,

4   and using the Knukle website.  Plaintiffs argue the bad intent is evidenced by the conversion of the

5   domain name www.knukleinc.com and use of the Knukle Two mark.

6       Defendants argue the key issue is whether the Legges acted in bad faith.  They argue it is

7   undisputed that the parties agreed to a 50-50 partnership.  According to defendants, the website is

8   registered to Knukle Two, demonstrating the good faith of the Legges.

9
ii.     Analysis

10       The Anticybersquatting Consumer Protection Act ("ACPA") is an amendment to the Lanham

11   Act that targets cybersquatting.[6]  An ACPA violation occurs when a domain name registrant (1)

12   registers, uses, or traffics in a domain name that (2) is identical or confusingly similar to a distinctive

13   or famous trademark, with (3) bad faith intent to profit from the trademark.  See 15 U.S.C. § 1125(d).

14       In the instant case, plaintiffs have shown a likelihood that defendants have committed

15   cybersquatting in violation of the ACPA.  The Legges (1) registered a domain name that (2) is

16   identical to the distinctive Knukle trademark, with (3) the bad faith intent to profit from the trademark.

17   As discussed above, the Legges' bad faith is evidenced by their covert control of the website, the use

18   of the infringing Knukle Two mark, and the exclusion of plaintiffs from their own company's website.

19   Defendants have a bad faith intent to profit from the trademark by using the site.

20       The fact the site is registered to Knukle Two is irrelevant.  Defendants admit that Grooms and

21   Phelan were never given their shares of Knukle Two; therefore, Knukle Two is wholly owned and

22   operated by the Legges.  As such, the Legges could have, and did, use Knukle Two's control of the

23   domain name to prevent plaintiffs from accessing the site.

24
**B.     Irreparable Harm**

25
i.     Plaintiffs' Arguments

26
_____

27       [6] "Cybersquatting" occurs when an "individual other than the trademark owner registers a domain name similar or identical to the trademark and 'then attempts to profit from this by either ransoming the domain name back to the trademark holder or by using the domain name to divert

28   business from the trademark holder to the domain name holder.'"  Verizon California Inc. v. Online NIC Inc., 2008 WL 5352022 (N.D. Cal. December 19, 2008).

1    Plaintiffs argue they triggered a presumption of irreparable injury by showing the likelihood

2    of success on the merits in a trademark case, citing Columbia Pictures Indus. v. Miramax Films Corp.,

3    11 F. Supp. 2d 1179, 1184 (C.D. Cal. 1998).   Further, even if the court does not apply the

4    presumption, plaintiffs argue they would suffer damage to their business reputation, trademarks, trade

5    name, and goodwill.   Further, plaintiffs argue defendants have recently sought further investment,

6    demonstrating that they are headed to insolvency – which would damage the image of the Knukle

7    mark.

8    ii.    Analysis

9    A preliminary injunction "may only be granted when the moving party has demonstrated a

10   significant threat of irreparable injury."   Simula, Inc. v. Autoliv, Inc., 175 F.3d 716, 725 (9th Cir.

11   1999).   "The possibility that adequate compensatory or other corrective relief will be available at a

12   later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm. "

13   Sampson v. Murray, 415 U.S. 61, 90 (1974).   Establishing a risk of future harm is insufficient, the

14   harm must be imminent.   Caribbean Marine Serv. Co., Inc. v. Baldridge, 844 F.2d 668, 674 (9th Cir.

15   1988).   Even if plaintiffs establish success on the merits, "the absence of a substantial likelihood of

16   irreparable injury would, standing alone, make preliminary injunctive relief improper."   Siegel v. Le

17   Pore, 234 F.3d 1163, 1176 (11th Cir. 2000).

18   The normal calculus is altered somewhat in a trademark infringement case, in that

19   "[i]rreparable injury is ordinarily presumed upon a showing of a likelihood of success." Abercrombie

20   & Fitch Co. v. Moose Creek, Inc., 486 F.3d 629, 633 (9th Cir.2007); Vision Sports, Inc. v. Melville

21   Corp., 888 F.2d 609, 612 n. 3 (9th Cir.1989) ("In trademark infringement or unfair competition

22   actions, once the plaintiff establishes a likelihood of confusion, it is ordinarily presumed that the

23   plaintiff will suffer irreparable harm if injunctive relief is not granted.").   Therefore, the Court

24   presumes irreparable harm.

25   Even without this presumption, plaintiffs have demonstrated the threat of irreparable harm.

26   In Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc., 240 F.3d 832, 841 (9th Cir. 2001), the

27   Ninth Circuit found threatened loss of prospective customers and goodwill constitutes irreparable

28   harm in the trademark context.   In the instant case, plaintiffs have shown defendants have already

1  coopted customers.  Further, defendants' attempts to register the Knukle Two mark threatens the value

2  of the Knukle mark.  Therefore, plaintiffs have shown a threat of irreparable harm.

3  **C.      Balance of the Hardships**

4  i.      Parties' Arguments

5          Plaintiffs argue a failure to issue the injunction will destroy their business.  Plaintiffs argue

6  defendants' use of an infringing mark is not an injury, citing Hotmail Corp. v. Van$ Money Pie Inc.,

7  1998 WL 388389 at *8 (N.D. Cal. April 16, 1998); Cadence Design Systems, Inc. v. Avant! Corp.,

8  125 F.3d 824 (9th Cir. 1997).  Therefore, plaintiffs argue the balance tips sharply in their favor.

9          Defendants assert the balance of hardships does not favor the mandatory injunctions.

10  ii.     Analysis

11          Before an injunction may issue, the court must weigh the hardship injunctive relief may cause

12  defendants against the threatened harm to plaintiffs.  "[T]he real issue in this regard is the degree of

13  harm that will be suffered by the plaintiff or the defendant if the injunction is *improperly* granted or

14  denied."  Scotts Co. v. United Industries Corp., 315 F.3d 264, 284 (4th Cir. 2002).

15          In the instant case, the Court finds the potential irreparable harm to plaintiffs outweighs any

16  injury to defendants.  If the injunction is not issued, plaintiffs will continue to suffer injury to their

17  business and loss of good will in the community.  If the injunction is issued, defendants will be forced

18  to cease selling inventory bearing either the Knukle mark or the Knukle Two mark.  However,

19  defendants do not have a right to reap profits from marketing work that infringes plaintiffs' trademark.

20  Accord, Hotmail Corp., 1998 WL 388389 at *8; see also Cadence Design Sys., 125 F.3d at 830

21  (noting the balance of hardships does not weigh against entry of a preliminary injunction where the

22  only alleged hardship to defendant was the loss of profits from marketing work that infringed a

23  copyright).

24  **D.      Requested Mandatory Injunctions**

25          The Court GRANTS the Mandatory Injunction requiring payment of funds into a court blocked

26  account because, as detailed above, the facts and law clearly favor plaintiffs with regard to funds

27  earned through the sale of Knukle clothing.  Further, the Court GRANTS the Mandatory Injunction

28  requiring defendants identify any third party who has a current order pending with Knukle Two

because the facts and law clearly favor plaintiffs.

However, the Court DENIES the requested mandatory injunction which would require defendants turn over control of the website.  This would significantly alter the status quo and is unnecessary.[7]  Further, the Court DENIES the requested mandatory injunction which would require defendants turn over designs, silk screening, artwork, films, and other materials necessary to produce apparel and promotional material.  The right to these materials are disputed because the Legges paid for the items and plaintiffs provided use of the trademark.  Given this lack of clarity, the Court cannot issue the requested mandatory injunction.

**E.      Conclusion**

In conclusion, the Court GRANTS the prohibitory injunctions to maintain the status quo. Specifically, the Court grants the requested injunction which prohibits the Legges from using the Knukle name, the Knukle marks or substantially similar marks, and www.knukleinc.com.  The Court GRANTS the mandatory injunction requiring payment of funds into a blocked account and releasing the names of customers with pending Knukle Two orders.  However, the Court denies the mandatory injunctions regarding the transfer of the website and materials necessary to produce the apparel and promotional materials.

**II.      MOTION FOR CONTEMPT, SANCTIONS, AND ATTORNEYS FEES**

i.      <u>Parties' Arguments</u>

Plaintiffs request the Court adjudge the Legges to be in civil contempt for three purported violations: (1) failing to transfer ownership and control of the website www.knukleinc.com to plaintiffs, pursuant to page 3, line 5-6 of the TRO; (2) continuing to exercise control of the website, purportedly in violation of page 2, lines 2 through 24 of the TRO; and (3) failing to "place all funds and accounts receivable from the [prior] sale of clothing, merchandise, and accessories bearing plaintiffs' trademarks . . . into an account designated by plaintiffs, purportedly in violation of page 3, lines 1-4 of the TRO.  As sanctions, plaintiffs request the Court impose a $5000 fine and award the

---

[7] At oral argument, plaintiffs argued transfer of the site was necessary because defendants can still send and receive emails under the domain name www.knukleinc.com.  However, a mandatory transfer of the site is unnecessary because use of email that includes the domain "knukleinc.com" is prohibited under the injunction that prohibits defendants from using the "Knukle Inc"in commerce.

1    attorneys' fees that plaintiffs accrued in the course of bringing this motion.

2            Defendants assert Mr. Jain's out-of-town trip to attend to a family emergency caused the initial

3    delay of their compliance with the TRO.  Defendants contend they substantially complied with the

4    order once Mr. Jain returned on March 24, 2009.  Defendants shut down the website, took down the

5    MySpace page, and ceased the operations of Knukle Two.  Defendants assert their failure to turn over

6    control of the website and domain name www.knukleinc.com occurred because they found the

7    language of the TRO confusing.  Defendants note they made an ex parte motion seeking clarification

8    of the order on March 30, 2009.  At oral argument, defendants claimed they had no funds to turn over.

9    ii.      Analysis

10           Defendants' failure to transfer control of the website did not violate page 3, line 5-6 of the

11   TRO.  The defendants' actions "appear[] to be based on a good faith and reasonable interpretation"

12   of the Court's order.  Go-Video v. Motion Picture Ass'n of Am., 10 F.3d 693, 695 (9th Cir. 1993).

13   This conclusion is buttressed by the fact Magistrate Judge Battaglia found the language of the TRO

14   confusing and ordered defendants seek clarification from this court.  Most importantly, this Court

15   adopted defendants' interpretation of the TRO in its April 1, 2009 order.  Therefore, plaintiffs have

16   not sufficiently proven this ground for contempt.

17           Defendants' failure to transfer control of the website did not violate page 2, lines 2 through

18   24.   That portion of the TRO prohibited defendants from exercising control over plaintiffs'

19   trademarks, using plaintiffs' trademarks in commerce, or using the domain name and website

20   www.knukleinc.com.  Defendants complied with these portions of the TRO by shutting down the

21   website. Currently the website is merely a yellow page, which reads "This website is temporarily out

22   of service."  Defendants' status as the registered owners does not violate the TRO.

23           Finally, it is unclear whether defendants failed to "place all funds and accounts receivable from

24   the sale of clothing, merchandise, and accessories [bearing the Knukle marks] in an account

25   designated by plaintiffs."  (TRO, p. 3, ln. 1-3.)  Plaintiffs assert they believe defendants are

26   withholding funds from the accounts.  This bald accusation does not carry plaintiffs' burden of

27   proving a violation by "clear and convincing evidence."  Plaintiffs have not shown by clear and

28   convincing evidence that defendants should be adjudged to be in civil contempt; therefore, the Court

1    DENIES plaintiffs' motion.

2    **III.      DEFENDANTS' MOTION TO STRIKE EVIDENCE**

3          Defendants request the Court strike evidence from the declarations filed in support of

4    plaintiffs' motion for preliminary injunction and plaintiffs' reply.  Specifically, defendants request the

5    Court strike paragraph 7 of the Declaration of Vickie Johnson and various paragraphs of the Phelan

6    Declaration.  To the extent defendants object on grounds suitable for review at this stage, these

7    objections are DENIED AS MOOT because they did not affect the Court's decision.

8                                      **CONCLUSION**

9          For the foregoing reasons, the Court (1) GRANTS IN PART the requested preliminary

10   injunction; (2) DENIES the motion for contempt, sanctions, and attorneys' fees; and (4) DENIES

11   defendants' motions to strike evidence.

12         The Court hereby orders, PENDING TRIAL OF THIS ACTION, defendants and all of their

13   representatives, servants and agents, employees, officers, directors, partners, attorneys, subsidiaries,

14   and all other persons or entities under defendants' control, or acting in concert or participation with

15   them, ARE HEREBY RESTRAINED AND ENJOINED (except with respect to any and all purchase

16   orders or contracts entered into before March 19, 2009, by and between Defendants and any customer,

17   retailer, distributor, manufacturer or other supplier or purchaser with respect to merchandise bearing

18   the trademarks or trade names: "Knukle Inc," "Knukle, Inc." or "Knukle" with the second "k" facing

19   forwards or backwards) from:

20         a.      holding themselves out as rightful owners of the "Knukle, Inc." enterprise;

21         b.      asserting ownership rights and control over Plaintiffs' property and intellectual

22                 property rights, including, but not limited to the Knukle Marks and/or Names, and the

23                 domain name and website, "www.knukleinc.com";

24         c.      the unauthorized use of the Knukle Marks in commerce;

25         d.      the unauthorized use of the Knukle Names in commerce;

26         e.      the unauthorized use of the domain name and website, "www.knukleinc.com";

27         f.      the unauthorized use of photographs, graphics, and designs bearing the Knukle Marks

28                 and/or Names whether published or not published including, the worldwide web,

"www.knukleinc.com", "www.knukleincclothing.com", Facebook, MySpace, traditional media channels, word of mouth, or in any other type of marketing or advertising until further determination of the rights and liabilities of the parties at trial;

g.   any and all future marketing, sale or distribution, or contracting for the marketing, sale or distribution of clothing, merchandise, and accessories bearing the Knukle Marks and/or Names or until further determination of the rights and liabilities of the parties;

h.   operating Knukle Two to compete with Plaintiffs' business activities related to the "Knukle, Inc." enterprise; and

ORDERED TO:

a.   with respect to any and all purchase orders or contracts entered into before March 19, 2009 by Defendants and any customer, retailer, distributor, manufacturer or other supplier or purchaser with respect to merchandise bearing the Knukle Marks and/or Names, defendants must place all funds and accounts receivable from any sale of clothing, merchandise, and accessories bearing the Knukle Marks and/or Names into the client trust account designated in Plaintiffs Notice of Designation of Bank Account filed with this Court on March 18, 2009, until further determination of the rights and liabilities of the parties at trial.

b.   provide names and contact information of all third parties who have currently placed orders with Knukle Two for merchandise bearing the Knukle Marks and/or Names.

The above Preliminary Injunction is effective on the filing of this order. Plaintiffs' undertaking of $10,000, which they posted to secure the TRO, will be applied to this preliminary injunction.

**IT IS SO ORDERED.**

DATED: April 8, 2009

IRMA E. GONZALEZ, Chief Judge
United States District Court